## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| C.B. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | NO. 1:20-CV-04213-AT |
| | ) | |
| NASEEB INVESTMENTS, INC. | ) | |
| d/b/a THE HILLTOP INN a/k/a | ) | |
| ECONOLODGE | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT NASEEB INVESTMENTS, INC.'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW, Defendant Naseeb Investments, Inc., (hereinafter "**Defendant**") and pursuant to Fed. R. Civ. P. 56, hereby files its Brief in Support of its Motion for Summary Judgment.  In support thereof, Defendant states as follows:

## INTRODUCTION

This lawsuit is part of a nationwide wave of dozens of cases filed in late 2019 and early 2020 using similar boiler-plate allegations which seek to hold the hospitality industry liable under the Trafficking Victims Protection Reauthorization Act ("**TVPRA**").  While the plaintiffs and defendants vary in each case, the complaints all follow a similar format: (1) general allegations that the

1

hospitality industry has turned a blind-eye to sex trafficking, and (2) specific allegations about the criminal trafficker's acts against the plaintiff in each case. The same is true in the instant case. Although the allegations regarding Plaintiff's victimization by her trafficker is horrifying, the evidence in this case, as set forth more fully below, is not sufficient to support Plaintiff's claims against Defendant.

Plaintiff's First Amended Complaint consists of two similar claims made pursuant to the TVPRA, as well as a claim for punitive damages and attorneys' fees.[1] In Count I – Civil Beneficiary Sex Trafficking Under 18 U.S.C. 1595(a) For Chappell's Violation of 18 U.S.C. 1591(a)(1), Plaintiff alleges that Defendant "knowingly benefitted financially" because Chappell gave payment to Defendant in exchange for the rental of two motel rooms. [ECF 13, ¶ 93]. Count II – Civil Beneficiary Labor Trafficking Under 18 U.S.C. 1595(a) For Chappell's Violation of 18 U.S.C. 1589(a)(2) & (4) essentially makes the same arguments against Defendant, i.e., that Defendant "knowingly benefitted financially" because Chappell gave payment to Defendant in exchange for the rental of two motel rooms. [ECF 13, ¶ 103]. However, a key element to recovery under the civil beneficiary provision of 18 U.S.C. 1595(a), regardless of whether the alleged conduct related to sex trafficking, forced labor, or a combination of both, is that the

---

[1]       The totality of Plaintiff's 1st Amended Complaint involves claims against Defendant pursuant to the civil beneficiary provision of the TVPRA. To the extent Plaintiff attempts to make a negligence argument in any opposition brief that may be filed, Defendant asserts that any such attempt is improper since a negligence claim was not asserted in the First Amended Complaint. Further, any such negligence claim would also necessarily fail due to the lack of actual or constructive knowledge of Defendant.

defendant must have actual or constructive knowledge that the venture for which the financial benefit received violated the criminal provision of the TVPRA. In fact, Plaintiff admits that the knowledge element is a key component to her claims. [ECF 13, ¶ 89.] Here, the record is devoid of any admissible evidence to support a finding that Defendant knew or should have known of Chappell's trafficking of Plaintiff, which necessarily warrants summary judgment as to Plaintiff's claims. Likewise, there is no evidence that Defendant knew or should have known that the financial benefit received from renting motel rooms to Chappell was a violation of the TVPRA. Because an award of punitive damages is predicated on a finding of liability, Plaintiff's claims for punitive damages must also fail.

## FACTUAL BACKGROUND

For approximately 24 - 36 hours in June 2010, on a single occasion, Plaintiff alleges that she was forced by Timothy Chappell to engage in sexual activity with approximately four (4) buyers. [ECF No. 13, ¶ 34; Deposition of C.B. ("C.B. Dep."), 176:2 – 5, cited excerpts not attached due to Defendant's Motion to File Under Seal.][2]  This horrific conduct is alleged to have occurred at the Hilltop Inn located at 3140 Moreland Avenue in Conley, Georgia. [ECF No. 13, ¶¶ 14, 26, 29, 34]. At all times pertinent to this matter, Defendant owned and operated the Hilltop

---

[2]     In an effort to protect Plaintiff's identity, as well as highly intimate and personal information that is contained in her testimony, Defendant filed a Motion and Brief in Support to file Plaintiff's complete, unredacted deposition transcript with exhibits under seal. Since that Motion is pending and this brief will be part of the public record, Defendant has not attached cited portions of Plaintiff's deposition testimony as an exhibit to this brief. However, Defendant is happy to provide the cited portions in a confidential manner if this Court so requests.

Inn. [Id., ¶ 14.] The Hilltop Inn is a three-story structure with an office-style lobby area, open air staircases, and open air hallways that lead to motel rooms. [Id., ¶ 17.]

Mr. Chappell checked into the Hilltop Inn in or around April of 2010. [Id., ¶ 19.] It is undisputed that Chappell was a registered sex offender at the time he checked into the Hilltop Inn. [Id.] At some point during his stay, Chappell posted an advertisement for a free room for rent on Craigslist. [Id., ¶ 21.] Plaintiff, who was fourteen years old at the time, responded to the advertisement and began regularly communicating with a name who identified himself as "Steve." [C.B. Dep., 23: 9-19.] After the communications started, Plaintiff turned fifteen and told "Steve" that she was fifteen years old. [Id., 24, 7-11 and   25: 14.] After communicating with "Steve" for a few weeks, he introduced her to Chappell. [Id., 27: 24-35 and 28: 1-6.] Chappell was also aware that Plaintiff was fifteen (15) years old. [Id., 32: 11-12.] Plaintiff continued to communicate with Chappell, through online chats and telephone calls, over the next several weeks. [Id., 36:23-37:1; ECF No. 13, ¶¶ 22-23.]

In June of 2010, Plaintiff agreed to meet Chappell in person. An unknown man picked Plaintiff up at her aunt's house and brought her to the Hilltop Inn. [C.B. Dep., 46:15 – 24.] When she arrived at the Hilltop Inn, Plaintiff had one or two pieces of luggage and her cell phone with her. [Id., 46:9 – 14.] Plaintiff's

4

intention in going to meet Chappell was that they were going to live together indefinitely. [Id., 47: 13 – 19.]

Prior to Plaintiff's arrival at the Hilltop Inn, Chappell went to the front desk and paid for a second room that was next to his. [ECF No. 13, ¶¶ 24-25.] When Plaintiff arrived, Chappell met her in the parking lot and then they went upstairs to the hotel room. [C.B. Dep., 47:20 – 48:1, 49:3 – 6.] Since the room had already been rented by Chappell, Plaintiff did not go to the front desk to check-in or get a key. [Id., 69: 14 – 19.] Instead, she went directly to the motel room rented by Chappell, where she was instructed by Chappell to stay in the room at all times. [Id., ECF No. 13, ¶ 29.] She complied with that instruction. [Id.]

Plaintiff was trafficked for sex on approximately four (4) occasions in June 2010 while she was at the Hilltop Inn. [ECF No. 13, ¶ 34.] Approximately 24 hours after arriving at the Hilltop Inn, Plaintiff decided that she wanted to go home and asked one of the "Johns" for help. [C.B. Dep., 62:7 – 17.] After Plaintiff made repeated phone calls to this unidentified man, he returned to the Hilltop Inn later that night and took Plaintiff back to the area near her aunt's house. [Id., 62: 15 – 25, 72: 7 – 15.] Plaintiff did not tell Chappell that she was leaving. [Id., 72:16 – 17.] This was the only time Plaintiff stayed at the Hilltop Inn.

While Plaintiff was at the Hilltop Inn, she did not have any interactions with any employees of the motel. The only interaction Plaintiff recalled involving a

motel employee was a "few seconds" of eye contact with a woman believed by Plaintiff to be in housekeeping. [C.B. Dep., 70:23 – 71:1, 71:24 – 72:4.] During Plaintiff's approximately 24-hour stay at the Hilltop Inn, she did not come and go from the motel for any reason. [Id., 69:20 – 70:4, 176: 2 – 5.] In fact, Plaintiff was only outside the motel room at the time that she arrived at the Hilltop Inn, for a few moments while she held her motel room door open for a "John", and when she left the Hilltop Inn. [Id., 69:25 – 70:4, 172:6 – 12.]

While undoubtedly tragic—and more than sufficient to hold her trafficker accountable—Plaintiff does not set forth facts asserting that Hilltop knew or should have known of the sex trafficking venture committed by Chappell.  Plaintiff's grievance is simply that Defendant received money from Chappell for the rental of two hotel rooms, and as a result, it should be held liable under the TVPRA.  [ECF No. 13, ¶¶ 93, 95, 103, 105].

<u>**ARGUMENT AND CITATION TO AUTHORITY**</u>

A.    STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-movant, there is no genuine issue as to any material fact. Fed. R. Civ. P. 56.   While the movant of such a motion bears the initial responsibility of asserting the basis for its motion, the burden is then shifted to the non-movant to present affirmative evidence to demonstrate that a genuine issue of

material fact does, in fact, exist. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); First Nat. Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289-90 (1968). "Speculation does not create a genuine issue of fact; instead it creates a false issue, the demolition of which is a primary goal of summary judgment." Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) (internal quotation marks omitted).

### B. PLAINTIFF'S CIVIL BENEFICIARY CLAIMS FAIL AS A MATTER OF LAW BECAUSE DEFENDANT DID NOT HAVE ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF PLAINTIFF'S TRAFFICKING

Plaintiff's Complaint contained conclusory and speculative allegations regarding why Defendant knew or should have known of Plaintiff's trafficking. While such allegations were likely pled in order to survive a motion to dismiss at the outset of this litigation, the evidence gathered during the discovery phase of this litigation has not uncovered sufficient admissible evidence to substantiate such claims. Importantly, the TVPRA includes a knowledge element which cannot be proven in this case. Specifically, the TVPRA provides as follows, in pertinent part:

(a)   Whoever knowingly –

(1)   in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2)     benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

Knowing, or except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a).

Section 1595(a), the TVPRA's civil remedy provision, in turn, provides:

An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys['] fees.

18 U.S.C. § 1595(a).

Put simply, to prove a claim for civil beneficiary liability under the TVPRA, a plaintiff must prove that the defendant (1) knowingly benefitted, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that undertaking or enterprise violated the TVPRA as to the plaintiff, and (4) the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff. G.W. v. Northbrook Industries, Inc., 2022

WL 1644923, at *2 (N.D. Ga. May 24, 2022). While the applicable case law and admissible evidence likely support the first and second elements of these claims, both for sex trafficking and labor trafficking, the evidence is wholly insufficient to support the third and fourth elements of Plaintiff's claims. <u>See</u>, <u>e.g.</u>, <u>A.B. v. H.K. Group of Co., Inc. d/b/a Stone Mountain Inn & Suites, et al.</u>, 2022 WL 467786, at *3 (N.D. Ga. February 9, 2022). Therefore, summary judgment is warranted.

Importantly, this Court recently dismissed a Plaintiff's TVPRA claims where the Plaintiff failed to allege a common undertaking between the defendant hotel operator and the alleged traffickers. <u>A.B. v. H.K. Group of Co., Inc. d/b/a Stone Mountain Inn & Suites et al.</u>, 2022 WL 467786 (N.D. Ga. February 9, 2022). In <u>A.B.</u>, the plaintiff made a TVPRA claim, among other claims, that is substantially similar to the claims at bar. In considering the defendants' motions to dismiss, Judge Batten held that while the "knowingly benefitted" element was pled sufficiently to survive the motions to dismiss, the plaintiff's TVPRA claim warranted dismissal because there was no plausible allegation that the defendant "took part in a common undertaking involving risk and potential profit while they had actual or constructive knowledge that they were violating the TVPRA." <u>Id.</u>, at *4. The mere suggestion of a financial benefit is not enough. Instead, there must be evidence of a common undertaking between the defendant and alleged traffickers involving risk and/or profit that violated the TVPRA, i.e., the alleged sex

trafficking ventures. Id. (internal citation omitted). Importantly, the A.B. court held that allegations of conversations with hotel employees, the cleaning of the plaintiff's hotel room, and the defendant's failure to assist the plaintiff or alert authorities were "at most…conclusory allegations" that were insufficient to support a TVPRA claim.

## 1. Defendant Did Not Have a Reasonable Opportunity To Observe Plaintiff.

A plaintiff may be able to prove the third element of a civil beneficiary TVPRA claim - that an undertaking or enterprise in which a defendant was engaged violated the TVPRA as to the plaintiff – where the defendant had a reasonable opportunity to observe the plaintiff. Id. at *3. Here, Plaintiff cannot establish that anyone associated with the Hilltop Inn had the "reasonable opportunity" to observe her. Moreover, the record is devoid of any evidence showing that Defendant knew Plaintiff was at the motel. Consequently, summary judgment is proper.

Defendant did not have knowledge that Plaintiff was at the motel. Plaintiff had no interactions with the owners, managers, or other staff at the Hilltop Inn. She did not go to the front desk to check-in, obtain a key, or for any other purpose. [C.B. Dep., 69:17 – 19.] She did not move around the motel or leave the motel for any purpose. [Id., 69:20 – 70:4.] Instead, she stayed in the room during the 48 – 72 hour time period that she was at the Hilltop Inn. [Id.] The only times she was

outside the room was when she arrived at the motel to go to the room and when she left the motel to escape her trafficker. [Id., 70:2 – 4.] In fact, the only interaction Plaintiff claims to have had with anyone employed or associated with the Hilltop Inn was a "few seconds" of eye contact with an unidentified female who Plaintiff believed to be a housekeeper. [Id., 70:23 – 71:23.] While Plaintiff also testified that she may have seen two other employees when she arrived at the Hilltop Inn, she admitted that she did not know if the individuals were guests or workers. [Id., 71:24 – 72:4.]

The only admissible, non-speculative evidence of any interaction between Plaintiff and any employee of the Hilltop Inn is a few seconds of eye contact with a housekeeper in the hall. This brief interaction that lasted for a few seconds hardly meets the "reasonable opportunity to observe" as set forth by the Georgia Court of Appeals. Indeed, this Court recently provided important and illustrative guidance as to what could constitute a reasonable opportunity to observe in G.W. v. Northbrook, Industries, Inc., 2022 WL 1644923 (N.D. Ga. May 24, 2022). In G.W., the plaintiff alleged that she was trafficked for sex at the United Inn. Id., at *1. The plaintiff filed suit against the hotel owner and operator, alleging claims under the TVPRA and common law negligence. Id. At the outset of the litigation, the defendant filed a motion to dismiss, the consideration of which was deferred while the Eleventh Circuit Court of Appeals considered Doe #1 v. Red Roof Inns,

Inc., 21 F.4th 714 (11th Cir. 2021).  After the <u>Doe #1</u> decision was entered, Judge Boulee considered the <u>G.W.</u> motion to dismiss. In holding that G.W.'s TVPRA claims were sufficiently pled to survive a motion to dismiss, Judge Boulee held that the complaint sufficiently pled allegations of instances where the defendant may have had the reasonable opportunity to observe the plaintiff. For instance, the plaintiff alleged that her hotel room was close to and within view of the hotel lobby and front desk. <u>Id.</u>, at *1.  The plaintiff also alleged that she had at least two interactions with hotel staff, including speaking to front desk employees when she was locked out of the room and purchasing condoms at the front desk. <u>Id.</u> In fact, it was alleged that a front desk employee walked the plaintiff back to her hotel room and opened the room after the plaintiff was locked out. <u>Id.</u>

The multiple and personal interactions that were found to constitute a reasonable opportunity to observe in <u>G.W.</u> are not present in this case. Again, the only evidence of any interaction between Plaintiff and any employee of the Hilltop Inn is a few seconds of eye contact. Moreover, even if this momentary interaction were determined to be sufficient to meet the observation requirement, Plaintiff's claims would still fail. As astutely noted by the Court of Appeals, "observing something is not the same as participating in it." <u>Doe #1 v. Red Roof Inns., Inc.</u>, 21 F.4th 714 (11th Cir. 2021). Therefore, because Plaintiff cannot prove that Defendant had any knowledge of Plaintiff's presence at the Hilltop Inn and, more importantly,

had *any* opportunity, let alone a ***reasonable*** opportunity, to observe Plaintiff, the analysis should properly stop here and summary judgment should be granted in favor of Defendant.

### 2.    Defendant Had No Knowledge of Plaintiff's Trafficking.

Even if Plaintiff were able to overcome the knowledge element above, her claims would still fail because there is no evidence to suggest, let alone prove, that Defendant had actual or constructive knowledge that the benefit it received, i.e., the amounts paid by Chappell for the rental of two motel rooms, in any way violated the TVPRA. As discussed above, Defendant had no knowledge of Plaintiff's presence at the Hilltop Inn.  Likewise, it had no knowledge that Plaintiff was a victim of sex trafficking while she was at the property. Similarly, it had no knowledge that Chappell was engaging in sex trafficking during his stay at the Hilltop Inn. Unlike the allegations against the defendant hotel in G.W., here, there is no evidence to suggest that Chappell had previously rented rooms at the Hilltop Inn for trafficking purposes. G.W. v. Northbrook Industries, Inc., 2022 WL 1644923 at *1. Similarly, there are no allegations that Hilltop Inn employees acted as lookouts and/or notified Chappell of police activity at the motel. Id.

While the civil beneficiary liability under the TVPRA requires knowledge of a violation of the TVPRA involving the plaintiff, even a broader standard would not save Plaintiff's claims in this case. Here, there is no evidence that Chappell had

stayed at the Hilltop Inn prior to arriving at the property in April of 2010. Additionally, Hilltop Inn denies that it knew or should have known that Chappell was a convicted sex offender. Even if Defendant had possessed or learned of such knowledge during Chappell's stay, there would have been nothing inherently wrong and certainly nothing illegal about renting a motel room to Chappell, a fact that Plaintiff's hotel operations expert, Alan Tallis, conceded. [Deposition of Alan Tallis ("Tallis Dep."), 75: 17:19, cited excerpts attached hereto as Exhibit "A".] While certain members of the public may not like the idea of people like Chappell having the ability to freely engage in activities such as renting and staying in motels, the alternative would necessarily result in hotels, motels, and other businesses engaging in a highly invasive exercise of asking guests about their criminal past before agreeing to do business with them, which would be burdensome, embarrassing, and would likely lead to a host of other issues. Moreover, the mere presence of sex offenders at a hotel property does not lead to sex trafficking. [Id., 77: 1 – 3.] While Defendant anticipates that Plaintiff will argue that allowing sex offenders to stay at the Hilltop Inn was problematic, the evidence actually shows that the DeKalb County police department told registered sex offenders that they could stay at the Hilltop Inn. [Id., 76: 10 – 14.]  Further, a hotel operator is under no duty to ask its guests during the check-in process or at any other time during their stay if they are sex offenders. [Id., 103: 8 – 11.]

Perhaps most importantly, both Plaintiff's hotel operations expert and security expert admit that Plaintiff was the first sex offender to cause any issues while staying at the Hilltop Inn. [Id., 76: 21 – 24; Deposition of Fred Del Marva ("Del Marva Dep."), 147: 14 – 19, 149: 19 – 23, cited excerpts attached hereto as Exhibit "B".]

Additionally, Defendant had no reason to suspect that sex trafficking was occurring or was likely to occur at the Hilltop Inn. There were no prior reports or incidents of sex trafficking at the property. [DeKalb County Police Department Crime Grid ("Crime Grid"), Del Marva Dep., Ex. 11, Tab 16, attached hereto as Exhibit "C".] There is no allegation of any wrongdoing on the part of Defendant's employees. [See, generally, ECF 13.] Instead, Plaintiff's conclusory statements as alleged in her Complaint remain just that – conclusory statements. For instance, there is no evidence to support Plaintiff's claim that Plaintiff "exhibited numerous well-known and visible signs of a trafficking victim in the common areas/hallways/parking lots." [Id., at ¶76.] Contrarily, the evidence, specifically Plaintiff's testimony, actually disproves this allegation, as she was not present for any appreciable amount of time in the common areas, hallways, and parking lots. Plaintiff's allegations that her room showed signs of sex trafficking [Id., at ¶ 77] must also fail because the evidence shows that housekeeping did not enter Plaintiff's room during the time she was at the Hilltop Inn.

Finally, Defendant also anticipates that Plaintiff will rely heavily on the contradictory testimony between the hotel owners and manager and former employees regarding the presence of prostitutes at the Hilltop Inn. However, this is not sufficient to create a genuine issue of material fact regarding Plaintiff's claims in this case. Assuming, *arguendo*, that Defendant had full knowledge that prostitution was occurring at the Hilltop Inn, there is no admissible evidence in the record to prove that Defendant knew or should have known that the presence of prostitution would lead to Plaintiff's sex trafficking. Plaintiff's expert, Mr. Tallis, admitted that he was not aware of any studies that linked the presence of prostitution to sex trafficking. [Tallis Dep., 43: 6 – 12.] Moreover, both of Plaintiff's experts acknowledged that there were no formal training programs on indicators of sex trafficking available throughout the hospitality industry at the time of Plaintiff's trafficking in 2010. [Id., 99: 14 – 100: 3, 101: 7 – 9; Del Marva Dep., 106: 19 – 107: 12]. Most importantly, this Court has held that allegations of customer complaints about prostitution existing on a property – which we do not have in this case – is insufficient to meet a known or should have known standard under either 18 U.S.C. §§ 1595(a) or 1591(a). Doe 1 v. Red Roof Inns., Inc., 2020 WL 1872335 (N.D. Ga. April 13, 2020).

While Plaintiff may attempt to rely on the benefit of hindsight in an effort to defeat summary judgment, such reliance would be misplaced. The crux of this

16

analysis must center on what the Defendant knew or should have known at the time of Plaintiff's trafficking in 2010. The harsh reality is that sex trafficking prevention education and awareness was in its infancy stage in 2010 and the evidence is insufficient to show that Defendant knew or should have known of any potential link between prostitution and sex trafficking. **Perhaps the most telling piece of evidence in this case is Mr. Tallis' admission that even when a hotel does everything right and pays attention to all the warning signs that we now know to be potential indicators of sex trafficking, sex trafficking still occurs**:

Tallis Dep., p. 145:

```
11              Have you reviewed a sex trafficking case
12   on behalf of a plaintiff, and found that the steps taken
13   by the hotel or the lodging facility were reasonable,
14   and you would not agree to take on the engagement?
15       A.   One case, yes.
```

...

```
22   was a limited-service hotel located in Florida, in a
23   reasonably good area.  The property had a problem with
24   drugs and with prostitution, and that property, much to
25   the credit of the manager, okay, documented every
```

Tallis Dep., p. 146:

17

```
1   incident of prostitution, documented every incident
2   where they were forced to call law -- law enforcement,
3   and documented the training exercises that they
4   subjected their employees to.

...

10       Q.   Well, so a woman had been trafficked at this
11  property, correct?
12       A.   Several women had been trafficked.
13       Q.   Several women, all right.

...

20       Q.   And they had the kind of training that you've
21  been talking about during the course of this deposition,
22  true?
23       A.   They -- they were training, yes.
24       Q.   Okay.  And they had, they documented and
25  prostitution occurred and was documented, correct?
```

Tallis Dep., p. 147:

```
1       A.   Yes.
2       Q.   Okay.  And despite those efforts by that
3   property owner, sex trafficking still occurred at that
4   hotel, yes?
5       A.   Yes.
```

## C.   PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES AND ATTORNEYS' FEES ARE DERIVATIVE AND MUST ALSO FAIL AS A MATTER OF LAW

It is undisputed that the TVPRA's civil remedy provision creates a cause of

action that sounds in tort and, as such, allows for the potential of an award of punitive damages. <u>Arreguin v. Sanchez</u>, 398 F.Supp.3d 1314, 1329 (S.D. Ga. 2019) (awarding punitive damages in TVPRA case involving forced labor of immigrant workers recruited and employed through the Department of Labor's H-2A foreign agricultural worker program). Nevertheless, Plaintiff has the burden to produce "specific facts" to support her claims, including her claim for punitive damages, and punitive damages are only warranted when the defendant is found liable for "conduct involving some element of outrage similar to that usually found in crime. Fed. R. Civ. P. 56(a); Restatement (Second) of Torts § 908, cmt. B. (1979). As detailed above, Plaintiff has failed to produce sufficient evidence to establish any genuine issue of material fact to survive summary judgment as to her civil beneficiary liability claims against Defendant. Because awards of punitive damages and attorneys' fees are predicated on an initial finding of liability for the underlying tort, the Court must grant summary judgment on these claims as well.

<u>**CONCLUSION**</u>

What happened to Plaintiff is unfortunate and tragic. However, this is not sufficient to hold Defendant liable for any wrongdoing arising from or related to the terrible acts committed by Chappell. The evidence and case law support summary judgment in favor of Defendant because the record is devoid of any evidence to support a key element of Plaintiff's claims – that Defendant had actual

or constructive knowledge of her trafficking. While this area of law is relatively new and rapidly developing, the emerging body of case law is clear that Defendant cannot be found liable for violating the TVPRA when it had no knowledge of Plaintiff's trafficking or of Chappell's trafficking venture.

Therefore, Defendant respectfully requests that this Court **GRANT** its Motion for Summary Judgment and for any other relief this Court deems just and proper.

This 16th day of August, 2022.

SWIFT, CURRIE, McGHEE & HIERS

By:     */s/  Kori E. Eskridge*_____
        Roger E. Harris
        Georgia State Bar No. 331302
        Kori E. Eskridge
        Georgia State Bar No. 155438
        Tracy A. Gilmore
        Georgia State Bar No. 633193
        *Attorneys for Defendant Naseeb*
        *Investments, Inc.*

The Peachtree, Suite 300
1355 Peachtree Street, N.E.
Atlanta, Georgia, 30309
Tel:  404.888.6162
Roger.harris@swiftcurrie.com
kori.eskridge@swiftcurrie.com
tracy.gilmore@swiftcurrie.com

## <u>CERTIFICATE OF COMPLAINCE</u>

I hereby certify this document was prepared in accordance with Court Rule

L.R. 5.1B, N.D. Ga., in the Times New Roman (14 point) font.


SWIFT, CURRIE, McGHEE & HIERS

By:   */s/ Kori E. Eskridge*_____ _____
Roger E. Harris
Georgia State Bar No. 331302
Kori E. Eskridge
Georgia State Bar No. 155438
Tracy A. Gilmore
Georgia State Bar No. 633193
***Attorneys for Defendant Naseeb***
***Investments, Inc.***

The Peachtree, Suite 300
1355 Peachtree Street, N.E.
Atlanta, Georgia, 30309
Tel:   404.888.6162
Roger.harris@swiftcurrie.com
kori.eskridge@swiftcurrie.com
tracy.gilmore@swiftcurrie.com

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that on the 16th day of August, 2022, I have caused to be served upon counsel for all parties a true and correct copy of the foregoing **<u>NASEEB INVESTMENTS, INC.'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>** by filing same through use of the Court's online filing system, the CM/ECF system for the United States District Court for the Northern District of Georgia, which will serve all counsel of record.

SWIFT, CURRIE, McGHEE & HIERS

By:   */s/ Kori E. Eskridge*_____
Roger E. Harris
Georgia State Bar No. 331302
Kori E. Eskridge
Georgia State Bar No. 155438
Tracy A. Gilmore
Georgia State Bar No. 633193
***Attorneys for Defendant Naseeb Investments, Inc.***

The Peachtree, Suite 300
1355 Peachtree Street, N.E.
Atlanta, Georgia, 30309
Tel:  404.888.6162
Roger.harris@swiftcurrie.com
kori.eskridge@swiftcurrie.com
tracy.gilmore@swiftcurrie.com

4896-1910-2510, v. 1

Page 43

1    for trafficking to occur, because where there are

2    prostitutes there are pimps, and pimps also traffic.

3        Q.   Well again, sir, I take it you understand the

4    distinction between an association and a correlation?

5        A.   I do.

6        Q.   Okay.  And have you seen anything -- anything

7    that has looked at budget motels, economy motels that

8    has discussed, described, outlined, highlighted any type

9    of an association between the presence of prostitution

10   at those type entities and sex trafficking?

11       A.   I have not seen any studies, because I don't

12   think any studies have ever been done.

13       Q.   Have you seen any presentations that have

14   talked about an association between prostitution present

15   at a certain segment of the hospitality industry leading

16   to a certain incidence of sex trafficking?

17       A.   I can answer your question in this fashion.

18       Q.   Okay.  Answer it yes or no first, and then

19   explain?

20       A.   Can't answer yes or no, because it's -- years

21   ago, the AH&LA asked myself and another hotelier to co-

22   chair a best practices in mid-scale segment, and we

23   talked about all kinds of operational practices.  All

24   brands were -- were represented.

25                 And I do specifically recall, at those



Exhibit A

1    Timothy Chappell?

2         A.    (No verbal response.)

3         Q.    You understand something, Mr. Tallis, you're

4    making quite an allegation here.

5                I want to know where the proof is that my

6    client knew it was -- that it was Timothy Chappell, as

7    opposed to the other sex offenders, because I'm very

8    knowledgeable about the fact that they had sex offenders

9    living on that property?

10        A.    My understanding from reading the depositions,

11   okay, is that they knew Mr. Chappell was a registered

12   sex offender, they saw the -- the -- a parade of people

13   come, come see him.  I mean, that's my recollection.

14        Q.    Is it -- with all of your industry experience,

15   is it your testimony that it is -- that it is -- first,

16   let me ask this.

17                Is it illegal for a hotelier to provide a

18   room to a known sex offender?

19        A.    No.

20        Q.    Okay.  Is it against industry best practices,

21   in your opinion, for a hotelier to provide a room to a

22   known sex offender?

23        A.    It isn't against industry best practices to

24   provide a room to a known sex offender, but industry

25   best practices would suggest, strongly, that if you have



Page 76

1    that type of occupancy, you in turn have to have

2    appropriate security, or take appropriate measures to

3    protect the safety and security of your other guests.

4         Q.   Was there any evidence that you saw, in

5    connection with what you reviewed regarding the sex

6    offenders that were living at this property, where any

7    -- there was any testimony that any sex offender

8    presented a problem for my client?

9         A.   No testimony, no.

10        Q.   And in fact, did you see the evidence in this

11   case that it was, in fact, DeKalb County police who

12   would tell registered sex offenders that they could go

13   and stay at my client's property?

14        A.   I -- I saw that.

15        Q.   Okay.  And in fact, you would agree with me

16   that the testimony that was in this case is that for --

17   that the sex offenders were the quietest people who were

18   at the property, weren't they?

19        A.   I would not agree or disagree with you.  I

20   don't know.

21        Q.   But you didn't see any evidence that any sex

22   offender that may have resided at that property at any

23   point in time caused any problems for them, did you?

24        A.   Not until the Plaintiff came, no.

25        Q.   Are you -- is it your opinion, Mr. Tallis,



1    that the presence -- the mere presence of sex offenders

2    on a hotel property is going to lead to sex trafficking?

3         A.    No, I didn't say that.

4         Q.    Okay.  Do you believe that to be true?

5         A.    I believe that if you house that type of

6    occupancy, you need to take the necessary precautions to

7    protect the safety and welfare of your other guests.  I

8    have no way -- in answer to your question, I have no way

9    of knowing whether a sex offender on the property is

10   going to lead to sex -- sex trafficking or not.  There's

11   never been any studies done in that regard.

12        Q.    How, in your 40-plus years of experience --

13   and I think you may have answered this question, if you

14   have, I apologize, but I want to make sure I understand.

15             Am I to understand from your testimony

16   that the dissemination of information through the

17   hospitality industry comes primarily from attending

18   conferences, and then talking about it afterwards?

19        A.    No.

20        Q.    How -- how does -- how does it -- okay.

21             How does information get disseminated

22   through the hospitality industry?

23        A.    In my experience, the people that attend the

24   conferences are brought up to date on recent

25   developments in the industry, enhancements to -- to best



Page 99

1        Q.   And tell me what formal training programs

2    existed prior to 2012 that would have provided training

3    to identify sex trafficking?

4        A.   I know -- I'm -- I know that at Red Roof there

5    was a pro -- a part of the managerial training that we

6    had for our franchisees, it included a block on

7    prostitution and trafficking.

8        Q.   Yeah.  And I'm talking about -- that would be

9    internal to Red Roof Inn, correct?

10       A.   That's what most of it was in -- in the

11   industry.

12       Q.   Okay.

13       A.   An internal --

14       Q.   Prior to 2012, was there any formalized

15   training program that was widely available throughout

16   the hospitality industry, not specifically internal to a

17   specific brand, but available throughout the hospitality

18   industry to provide training on the indicators of sex

19   trafficking?

20       A.   I believe there were.  I mean, if you look at

21   -- at -- at ECPAT, okay, if you look at Polaris, they

22   had training materials that were valid.

23       Q.   Were those formal training programs?

24       A.   I don't know if they were formal training

25   programs, but there was -- there was training aids



Page 100

1    available to members of the hospitality industry, to be

2    able to train their employees to identify potential

3    trafficking activities.

4         Q.   What else did you disagree with Mr. Del Marva

5    about, if anything?

6         A.   Give me a second to refresh --

7         Q.   Sure.

8         A.   -- my recollection?

9              He said there were no studies, no

10   treaties, no written standards, I disagree that there

11   were no written standards, hopefully explain why.

12        Q.   Well, what -- what do you consider to be

13   written standards?

14        A.   Well, to me, any brand, okay, that publishes

15   an operations manual, that's a standard.  That's a

16   standard by which all of the hotels under that brand

17   need to adhere.

18        Q.   Okay.

19        A.   There isn't a macro manual, okay, that is

20   applicable to all 95 or 100,000 hotels.

21        Q.   Right.  So if you -- you're telling me that if

22   Marriott produces an operations manual for its -- for

23   the franchisees under its brand, then that is a Marriott

24   standard to be followed by its franchisees, correct?

25        A.   That's right, uh-huh.



```
1        Q.   That is not an industry standard that is to be
2   followed by all other franchisees of other brands, is
3   it, or other brands for that matter?
4        A.   No.  The other brands would have their own
5   standards, and they usually copy Marriott, because of
6   how they -- it is the gold standard.
7        Q.   Is there a published set of industry-wide
8   standards that's available?
9        A.   No, not to my knowledge.
10       Q.   Okay.  Do you disagree with anything else that
11  Mr. Del Marva --
12       A.   No.
13       Q.   -- talked about?
14       A.   No, sir.
15            I mean, if I may?  I mean, if you're
16  talking about industry standards that are being
17  published, I can -- I can refer you to Stephen Barth's
18  treaties, he was in hospitality law.  I mean, but that's
19  --
20       Q.   Well, your --
21       A.   -- a little different.
22       Q.   Maybe you were looking at what I've marked as
23  Exhibit 8 to your deposition, so let's just go with
24  that.
25            (Defendant's Exhibit No. 8 was marked for
```



Page 103

1    points are specific to sex trafficking, are they?

2        A.    They're not specific to sex trafficking, but

3    again, if you look at the -- the first, particularly the

4    first bullet point, "As places of public accommodation,

5    hotels have a duty to operate with reasonable care

6    and maintain a safe and secure premise in accordance

7    with all applicable laws."

8        Q.    Does a hotel operator have a duty to ask its

9    guests, checking in, if they are registered sex

10   offenders?

11       A.    Certainly not.

12       Q.    Does a -- does a hotel operator have a duty,

13   once they check in a guest, to then go and search

14   databases to determine if that guest is a registered sex

15   offender?

16       A.    No, they don't.

17       Q.    Is a -- absent cause to do so, is a hotel

18   operator obligated to go and randomly knock on the doors

19   of its guests to inquire if there is any illicit

20   behavior going on in the room?

21       A.    That would be a violation of the guest's right

22   to privacy.

23       Q.    Right.  So the answer is no, correct?

24       A.    That's right.  Absent certain circumstances,

25   the answer is no.



Page 145

1                    I mean, are you familiar with the law in
2    Georgia on what's required of owners and op -- owners of
3    property?
4         A.   Not specifically.
5         Q.   Okay.  Anything else about -- well, I guess we
6    talked about training.
7                    Anything else about Atul Patel that you
8    want to make sure I'm aware of?
9         A.   No.
10        Q.   In -- in connection with your -- strike that.
11                   Have you reviewed a sex trafficking case
12   on behalf of a plaintiff, and found that the steps taken
13   by the hotel or the lodging facility were reasonable,
14   and you would not agree to take on the engagement?
15        A.   One case, yes.
16        Q.   Okay.  Tell me about that one?
17        A.   Well, I'm not going to tell you the name of
18   the hotel, okay, but --
19        Q.   Why, is there a protective order in place?
20        A.   No.  I just, I don't -- I'm just not going to
21   do it.  It's not -- it's not pertinent.  There was -- it
22   was a limited-service hotel located in Florida, in a
23   reasonably good area.  The property had a problem with
24   drugs and with prostitution, and that property, much to
25   the credit of the manager, okay, documented every



Page 146

1   incident of prostitution, documented every incident

2   where they were forced to call law -- law enforcement,

3   and documented the training exercises that they

4   subjected their employees to.

5              And I didn't review depositions, it was,

6   I think, just at the pleading stage.  But when I read

7   it, and then I started asking some questions, I could

8   not render an opinion that would have been favorable to

9   the people that were trying to hire me.

10      Q.   Well, so a woman had been trafficked at this

11  property, correct?

12      A.   Several women had been trafficked.

13      Q.   Several women, all right.

14              And despite all of those steps that led

15  you to tell this lawyer that you couldn't get involved,

16  the trafficking still occurred, true?

17      A.   Well, it occurred, but it -- it was stopped.

18      Q.   But it happened?

19      A.   Yes, it did happen.

20      Q.   And they had the kind of training that you've

21  been talking about during the course of this deposition,

22  true?

23      A.   They -- they were training, yes.

24      Q.   Okay.  And they had, they documented and

25  prostitution occurred and was documented, correct?



Page 147

```
 1        A.   Yes.

 2        Q.   Okay.  And despite those efforts by that

 3   property owner, sex trafficking still occurred at that

 4   hotel, yes?

 5        A.   Yes.

 6        Q.   Have you ever testified at trial in any case?

 7        A.   (No verbal response.)

 8        Q.   Have you testified at trial in any case?

 9        A.   Yes.  I just got finished testifying on behalf

10   of the State of Louisiana in a -- on a large case

11   against the owner of travel companies.

12        Q.   That was not sex trafficking case?

13        A.   No.

14             Oh, if you're asking if I testified at

15   trial on a sex trafficking case, no.  They have never --

16   the cases in which I've been involved have not gone to

17   trial.

18        Q.   Understood.  Have you given deposition

19   testimony or trial testimony on behalf of a lodging

20   facility where you testified -- regardless of the type

21   of case -- where you testified at trial, or gave

22   deposition testimony on behalf of a lodging facility,

23   that the facility met the standard of care, or had

24   reasonable practices in place?

25        A.   As it relates to sex trafficking?
```



1    expert, correct?

2         A.    Correct.

3         Q.    What is the standard of care in which you

4    consider yourself to be an expert?

01:32:25  5         A.    Standard of care is very simple.  It's create --

6    is what a reasonable person would do to create a safe and

7    secure environment and prevent and deter what is

8    reasonably foreseeable, and that that duty is

9    nondelegable.

01:32:51  10        Q.    So it's a reasonable person's standard?

11        A.    Correct.

12        Q.    So when you define it as a reasonable person's

13   standard, are you saying that it's what I would do?

14        A.    You would not be considered a reasonable person

01:33:12  15   not owning a motel.  So it's not just any person.  It's

16   somebody involved in the hospitality industry and what

17   they would consider reasonable for their particular

18   premises.

19        Q.    What, what information exists to tell an

01:33:39  20   operator of a lodging facility what the standard of care

21   is to prevent sex trafficking from occurring?

22        A.    Say that again, please.

23              MR. HARRIS:  Can you repeat that for me, Madam

24   Court Reporter.

01:34:25  25              (The record was read by the reporter as follows:

Exhibit B

1            What information exists to tell an operator of a
2    lodging facility what the standard of care is to prevent
3    sex trafficking from occurring?)
4            THE WITNESS:  In what time frame are we looking
01:34:30 5   at?
6    BY MR. HARRIS:
7        Q.    2010.
8        A.    Okay.  In 2010 there was nothing available to
9    the industry with regard to any formal training.  What
01:34:43 10  they had to rely on was their experience in the industry
11   and make observations whether or not it's foreseeable for
12   sex trafficking to occur at their premises.
13       Q.    And in 2010, Mr. Del Marva, what was the
14   reasonable operator doing to prevent sex trafficking?
01:35:17 15      A.    They were, or should have been, addressing
16   something like security vulnerability assessment, make a
17   security vulnerability assessment.  I'm not finished with
18   my answer.
19            On Tab 17, this is the portion of the National
01:36:03 20   Fire Protection Association, this is 2011.  That's an
21   association that develops international codes, and their
22   Chapter 13 is about lodging and what it --
23            To provide security the chapter addresses
24   measures to mitigate security vulnerability in lodging
01:36:32 25   facilities.  A lodging facility should have a security

Fred Del Marva, PI, PPO - May 4, 2022                    147

1   and a security expert that's my opinions.

2       Q.    Well, is it your opinion, Mr. Del Marva, that no

3   lodging facility should provide rooms to registered sex

4   offenders?

02:45:15  5       A.    That's my opinion, yes, sir.

6       Q.    Do you believe that it is within the law for a

7   lodging facility to ask somebody who wants a room if

8   they're a registered sex offender?

9       A.    I don't know what the law is, but, as an owner

02:45:29 10  of a hotel, if I owned a hotel or motel and I knew that

11  there were sex offenders I wouldn't allow them on my

12  premises.  That would be a reasonable thing for me to do

13  to prevent a foreseeable problem.

14      Q.    Did you see any evidence in the record that any

02:45:43 15  of the registered sex offenders that may have been staying

16  at The Hilltop Inn were creating any problems?

17      A.    There was no testimony to that.  There is no

18  evidence to that at all.  Other than, other than Chappell,

19  who was living there for months was a known sex offender,

02:46:01 20  and --

21      Q.    Known to who?

22      A.    Was known to Vic.

23      Q.    How did Vic know that Chappell was a registered

24  sex offender?

02:46:11 25      A.    He was told by his employees.

```
 1  foreseeable problems that are more likely than not to

 2  occur.

 3      Q.    Do you believe that registered sex offenders

 4  have the right to pay for their crime, make a living, and

 5  live in an area where they are allowed to live under the

 6  law?

 7      A.    Where they're allowed to live, I believe in

 8  that, yes.

 9      Q.    And if the only place that's available for them,

10  from an economic perspective, is a motel like The Hilltop

11  Inn, do you have a problem with that?

12      A.    If I was the owner of the Hilltop Inn I would

13  have a problem.  You have a right to refuse, and I

14  wouldn't want them at my motel if I owned the The Hilltop.

15          If they were not a problem why would they have

16  them put in a certain portion of the premises rather than

17  allow them to go in different rooms all over?  They

18  isolated them into a little section.

19      Q.    And I guess my response to that is so what?  Did

20  you see any evidence that there was any difficulty or

21  trouble with any registered sex offender who the evidence

22  would suggest was staying at The Hilltop Inn at any time?

23      A.    No.

24      Q.    Go to page two of your deposition.

25      A.    Page two of what, sir?
```

The time annotations in the left margin read: 02:47:32 (line 5), 02:47:41 (line 10), 02:48:06 (line 15), 02:48:26 (line 20), 02:49:16 (line 25).

# FRED DEL MARVA, PI, PPO, LLC

21666 North 58th Avenue, Glendale AZ 85308
*Telephone: (623)-566-5300 • Fax: (623) 566-5354*
*E-mail: liabilityexpert@cox.net • Web: freddelmarva.com*

*Premises Security*                                                                                    *Forensic Investigations*
*Premises Liability*                                                                                  *Expert Witness Testimony*
*Liquor Liability*                                                                                     *Security Consultant*

*Hotels • Restaurants • Bars • Nightclubs • Casinos • Sports Complexes, etc.*

---

## DEPOSITION BINDER

## TAB NUMBERS 1 - 25

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF GEORGIA

## ATLANTA DIVISION

C.B.

      **PLANTIFF**

      v

**NASEEB INVESTIMENTS, INC.**
**d/b/a THE HILLTOP INN**

      **DEFENDANT**

:
:
:
: **CIVIL ACTION**
:
:
: **FILE NO.: 1:20-CV-04213-AT**
:
:
:
:

**Exhibit C**



1

**Deposition Binder's Table of Contents**

1.  Fred Del Marva's CV

2.  Five year prior depositions and trial testimony

3.  Fred Del Marva's 02/25/2022, Opinions Report

4.  Deposition summary of Neemita Amin [Vic's wife/mgr.]

5.  Deposition summary of Vic Amin [motel owner/mgr.]

6.  Deposition summary of Atul Patel [motel owner]

7.  Deposition summary of James Johnson [front desk clerk]

8.  Deposition summary of Joan Blackmon [housekeeper]

9.  Deposition summary of ███████████ [Plaintiff]

10. Deposition summary of Pauline Madete [ECO LDGE front desk]

11. Deposition summary of Ricky Vaughn [motel maintenance]

12. Deposition summary of Jameika Lumbus [front desk clerk]

13. Hill Top's three mile, 2010 CAP SCORE - 486

14. Hill Top's six mile, 2010 CAP SCORE - 781

15. Hotel/Motel Industry three & six mile CAP SCORE – 175 -211

16. 2008-2009 CRIME GRID Report [prior criminal incidents at The Hill Top]

17. NFPA methodology 2011 [National Fire Protection Association]

18. Chappell's room's Folio & motel room's location chart

19. Pictures of plaintiff and Chappell

20. Signs of human trafficking

21. Hotel/motel Human Trafficking front desk sign

22. Dept. of Corrections report [re: Chappell at Hill Top]

23. Atul Patel's BEST certification

24. AHLA training course

25. Client retainer agreement and billing

PLVEMASEO  3/17/06

PRIOR TO /08  NOT REQUESTED

PLAINTIFF'S
EXHIBIT
7
PM 8/16/21

CRIME
GRID

| Case Number | Date Incident | Address | Case Description | Offense |
|---|---|---|---|---|
| 08-004710 | 01/09/2008 | 3140 MORELAND AVE | THEFT | BURGLARY - NO FORCED ENTRY - RESIDENCE 16-7-1 |
| 08-021422 | 02/15/2008 | 3140 MORELAND AVE | ARREST RELEASE | POINTING OR AIMING GUN OR PISTOL AT ANOTHER 16-11-102 |
| 08-030207 | 03/05/2008 | 3140 MORELAND AVE | PROPERTY DAMAGE | CRIMINAL DAMAGE TO PROPERTY IN THE SECOND DEGREE - PRIVATE 16-7-23 |
| 08-031437 | 03/08/2008 | 3140 MORELAND AVE | AGGRAVATED ASSAULT | |
| 08-032007 | 03/09/2008 | 3140 MORELAND AVE | ARMED ROBBERY | ARMED ROBBERY - RESIDENCE - OTHER WEAPON 16-8-41 |
| 08-032016 | 03/09/2008 | 3140 MORELAND AVE | PROPERTY DAMAGE | |
| 08-031315 | 03/07/2008 | 3140 MORELAND AVE | THEFT OF VEHICLE | THEFT BY TAKING - OF TRUCK/VAN/BUS 16-8-2 |
| 08-034641 | 03/15/2008 | 3140 MORELAND AVE | BATTERY-DOMESTIC | BATTERY 16-5-23.1 |
| 08-034641 | 03/15/2008 | 3140 MORELAND AVE | BATTERY-DOMESTIC | |
| 08-039116 | 03/24/2008 | 3140 MORELAND AVE | CHILD MOLESTATION | CHILD MOLESTATION 16-6-4 |
| 08-044865 | 03/28/2008 | 3140 MORELAND AVE | THEFT BY TAKING VEHICLE | |
| 08-047241 | 04/10/2008 | 3140 MORELAND AVE | BATTERY | BATTERY 16-5-23.1 |
| 08-047241 | 04/10/2008 | 3140 MORELAND AVE | BATTERY | THEFT BY TAKING - FREE TEXT 16-8-2 |
| 08-058683 | 05/03/2008 | 3140 MORELAND AVE | VEHICLE RECOVERY | |
| 08-059721 | 05/06/2008 | 3140 MORELAND AVE | ARMED ROBBERY | ARMED ROBBERY - STREET - GUN 16-8-41 |
| 08-059721 | 05/06/2008 | 3140 MORELAND AVE | ARMED ROBBERY | |
| 08-072873 | 06/01/2008 | 3140 MORELAND AVE | VEHICLE THEFT | THEFT BY TAKING - AUTOMOBILE 16-8-2 |
| 08-079235 | 06/14/2008 | 3140 MORELAND AVE | THEFT BY RECEIVING | THEFT BY RECEIVING STOLEN PROPERTY - MOTOR VEHICLE 16-8-7 |
| 08-081619 | 06/19/2008 | 3140 MORELAND AVE | FORGERY IN THE FIRST | FORGERY IN THE FIRST DEGREE - FREE TEXT 16-9-1 |
| 08-086317 | 06/28/2008 | 3140 MORELAND AVE | THEFT BY TAKING MOTOR VEHICLE | THEFT BY TAKING - AUTOMOBILE 16-8-2 |
| 08-121308 | 09/07/2008 | 3140 MORELAND AVE | PROPERTY  DAMAGE | |
| 08-139322 | 10/06/2008 | 3140 MORELAND AVE | IDENTITY THEFT | IDENTITY FRAUD 16-9-121 |
| 08-146606 | 10/28/2008 | 3140 MORELAND AVE | VEHICLE THEFT | THEFT BY TAKING - AUTOMOBILE 16-8-2 |
| 08-151731 | 11/09/2008 | 3140 MORELAND AVE | THEFT | THEFT BY TAKING - POCKET PICKING 16-8-2 |
| 08-171084 | 12/21/2008 | 3140 MORELAND AVE | SIMPLE BATTERY | SIMPLE BATTERY 16-5-23 |
| 08-173778 | 12/27/2008 | 3140 MORELAND AVE | ROBBERY | ROBBERY - STREET - STRONGARM 16-8-40 |
| 09-001649 | 01/04/2009 | 3140 MORELAND AVE | NARCOTICS | POSSESSION OF FIREARM OR KNIFE DURING THE COMMISSION OF OR ATTEMPT TO COMMIT CERTAIN CRIMES 16-11-106 |

CERTIFIED COPY

APR 2 3 2021

DeKalb County Police Department
Police Records Section

| | | | | |
|---|---|---|---|---|
| 09-001649 | 01/04/2009 | 3140 MORELAND AVE | NARCOTICS | POSSESSION OF FIREARMS BY CONVICTED FELONS AND FIRST OFFENDER PROBATIONERS 16-11-131 |
| 09-001649 | 01/04/2009 | 3140 MORELAND AVE | NARCOTICS | VGCSA - POSSESSION - COCAINE 16-13-30 |
| 09-001649 | 01/04/2009 | 3140 MORELAND AVE | NARCOTICS | CARRYING A CONCEALED WEAPON 16-11-126 |
| 09-002416 | 01/06/2009 | 3140 MORELAND AVE | AGGRAVATED ASSAULT | AGGRAVATED ASSAULT - OTHER WEAPON 16-5-21 |
| 09-012891 | 01/29/2009 | 3140 MORELAND AVE | THEFT OF AUTOMOBILE | THEFT BY TAKING - AUTOMOBILE 16-8-2 |
| 09-048966 | 04/17/2009 | 3140 MORELAND AVE | ENTERING AN AUTOMOBILE | ENTERING AN AUTOMOBILE - INTENT THEFT 16-8-18 |
| 09-099355 | 08/03/2009 | 3140 MORELAND AVE | THEFT BY TAKING | THEFT BY TAKING - FREE TEXT 16-8-2 |
| 09-102004 | 08/11/2009 | 3140 MORELAND AVE | CRIMINAL TRESPASS | CRIMINAL TRESPASS - DAMAGE <500 - BUSINESS 16-7-21 |
| 09-102004 | 08/11/2009 | 3140 MORELAND AVE | CRIMINAL TRESPASS | |
| 09-103175 | 08/13/2009 | 3140 MORELAND AVE | VGCSA | VGCSA - OTHER - COCAINE 16-13-30 |
| 09-145090 | 11/14/2009 | 3140 MORELAND AVE | RAPE | RAPE - STRONGARM 16-6-1 |
| 09-161159 | 12/22/2009 | 3140 MORELAND AVE | DOMESTIC VIOLENCE | BATTERY 16-5-23.1 |
| 09-161159 | 12/22/2009 | 3140 MORELAND AVE | DOMESTIC VIOLENCE | |
| 10-010835 | 01/26/2010 | 3140 MORELAND AVE | VGCSA | POSSESSION OF FIREARM OR KNIFE DURING THE COMMISSION OF OR ATTEMPT TO COMMIT CERTAIN CRIMES 16-11-106 |
| 10-010835 | 01/26/2010 | 3140 MORELAND AVE | VGCSA | VGCSA - SALES - MARIJUANA 16-13-30 |
| 10-017070 | 02/11/2010 | 3140 MORELAND AVE | THEFT BY TAKING | THEFT BY TAKING - FREE TEXT 16-8-2 |
| 10-037333 | 03/31/2010 | 3140 MORELAND AVE | THEFT OF VEHICLE | THEFT BY TAKING - OTHER VEHICLE |
| 10-044230 | 04/16/2010 | 3140 MORELAND AVE | THEFT BY TAKING | |
| 10-066932 | 06/06/2010 | 3140 MORELAND AVE | THEFT | THEFT BY TAKING - PARTS FROM VEHICLE 16-8-2 |
| 10-131161 | 11/07/2010 | 3140 MORELAND AVE | VEHICLE THEFT | THEFT BY TAKING - AUTOMOBILE 16-8-2 |
| 10-132885 | 11/11/2010 | 3140 MORELAND AVE | DOMESTIC | THEFT BY TAKING - AUTOMOBILE 16-8-2 |

CERTIFIED COPY

APR 2 3 2021

DeKalb County Police Department
Police Records Section