IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| C.B., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:20-cv-04213-AT |
| NASEEB INVESTMENTS, INC. | : | |
| d/b/a THE HILLTOP INN a/k/a | : | |
| ECONOLODGE, | : | |
| | : | |
| Defendant. | : | |

## **ORDER**

This case is one of a growing number of lawsuits in this district — and across the nation — involving claims that arise from sex trafficking at a hotel. Similar to other plaintiffs in these cases, Plaintiff in this case raises claims under 18 U.S.C. § 1595(a), which is sometimes referred to as the civil beneficiary provision of the Trafficking Victims Protection Reauthorization Act ("TVPRA").[1] Plaintiff brings these claims against Defendant Naseeb Investments, Inc. ("Naseeb"), which owns, operates, and manages the Hilltop Inn in Conley, Georgia. She contends Defendant benefited from child sex trafficking crimes against her when her trafficker coercively held her and sold her for commercial sex acts on Defendant's property in June 2010, when she was fifteen years old.[2] Her trafficker, Timothy Chappell,

---

[1] The TVPRA was enacted in 2000 and subsequently amended to add the civil beneficiary provision in 2008.

[2] The Court provides a brief note about the terminology used in this Order. Where feasible, the Court has endeavored to use terminology throughout this Order in line with

pleaded guilty and has been convicted of his crimes. (*See* Superseding Indictment, Doc. 53, *USA v. Timothy Lyle Chappell*, No. 1:10-cr-531-WSD-ECS (August 16, 2011); Chappell Guilty Plea and Plea Agreement ("Guilty Plea"), Doc. 120-10).

Currently pending before the Court is Defendant's Motion for Summary Judgment [Doc. 116]. A select number of courts have handled and interpreted the application of the TVPRA beneficiary statute in the context of summary judgment. After extensive review and consideration of this case, the Court finds that this case presents unique factual issues not found in other cases decided under this statute. But given the Eleventh Circuit's ruling in *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021) and the Eleventh Circuit's recent panel decision in *K.H., v. Riti, Inc.*, No. 23-11682, 2024 WL 505063 (11th Cir. Feb. 9, 2024), it is clear that the Eleventh Circuit intends the statute to be narrowly construed.[3]

*Riti* presented a complaint detailing how the minor age plaintiff, K.H., was trafficked for four years at the hotel owned, managed, and operated by defendant Riti and provided other allegations of prevalent sex trafficking at the hotel. *See Riti*, 2024 WL 505063, at *1. But the Eleventh Circuit affirmed the district court's dismissal of the plaintiff's complaint, finding that K.H. failed to plausibly allege

---

journalistic best practices for discussing sex trafficking. *See*, *e.g.*, The Irina Project, "Language Matters," https://perma.cc/7UTT-YBAZ (last accessed September 11, 2024). However, where an individual's testimony uses other language, for accuracy, the Court has quoted or paraphrased that testimony using the terms used by that person.

[3] Although the *Riti* opinion is unpublished, and "Eleventh Circuit Rule 36-2 provides that while unpublished opinions are not considered binding precedent," the district court may still treat such opinions as persuasive authority. *United States v. Riley*, 706 F. App'x 956, 963 (11th Cir. 2017).

that Riti "took part in a common undertaking or enterprise" with K.H.'s trafficker, such that its conduct violated the TVPRA's civil beneficiary provision. *Riti*, 2024 WL 505063, at *4. Given the guidance from the *Riti* panel's restrictive analysis of the statute and the Eleventh Circuit's prior *Red Roof* opinion, this Court reluctantly concludes that it must grant Defendant's Motion for Summary Judgment.[4]

The Court's discussion below proceeds first by discussing the background events and management practices that set the background for Plaintiff's sex trafficking at the Hilltop Inn in June 2010. The Court's Order then turns to Plaintiff's specific experience and an analysis of her legal claims.

## I. Background[5]

### A. The Hilltop Inn

The Hilltop Inn is located at 3140 Moreland Avenue in Conley, Georgia. (Pl.'s Resp. to Def.'s Statement of Material Facts ("SMF"), Doc. 121 ¶ 2; Vic Amin Dep., Doc. 144 at 7[6]; Receipts from Timothy Chappell's stay at Hilltop Inn ("Receipts"), Doc. 120-6). Defendant Naseeb, which is owned by Vic Amin, Atul Patel, Nalini Amin, and George Patel,[7] has owned the Hilltop Inn property since 2006. (Pl.'s

---

[4] The Circuit's more comprehensive revisiting of the statute would be helpful to the district courts handling these difficult issues.

[5] This factual description does not represent actual findings of fact. *In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007).

[6] All references to page numbers are based on the pagination in the Court's docketing system, CM/ECF.

[7] Nalini Amin is Vic Amin's mother and George Patel is Atul Patel's father. (Vic Amin Dep., Doc. 144 at 7).

Resp. to Def.'s SMF, Doc. 121 ¶ 3; Vic Amin Dep., Doc. 144 at 6-8). Vic Amin and Atul Patel exercised principal responsibility for management and operation of the hotel – with Vic Amin serving as the chief manager of Hilltop's operations.

The property has two adjoining buildings, which the Court will refer to as the "Lower" and "Upper" buildings. (Vic Amin Dep., Doc. 144 at 8). The Court includes a rough diagram to illustrate the positioning of the buildings.



The Lower Building retains the name Hilltop Inn; the Upper Building is now branded as an Econolodge.[8] (*Id.* at 10-11). At all times relevant to this suit, the entirety of the property was operating as Hilltop Inn. (*Id.* at 11).

At the time of the events in question, when the two buildings were operating as one hotel, Vic Amin "oversaw the operations" of the hotel. (Vic Amin Dep., Doc. 144 at 22; Neemita Amin Dep., Doc. 132 at 15-16). Atul Patel and Vic Amin's wife, Neemita Amin, assisted with the hotel's daily operations. (Vic Amin Dep., Doc. 144

---

[8] Defendant signed a franchise agreement in 2009 to make the Upper Building an Econolodge, but the name and branding were not changed until late 2010, after the events at issue in this case. (*Id.* at 10-11).

at 22; Neemita Amin Dep., Doc. 132 at 19-21, 35-37 (describing her role training front desk employees)). The hotel's front desk was then located in the Upper Building, now an Econolodge. (Vic Amin Dep., Doc. 144 at 12-13, 69). The property was equipped with "about 8" surveillance cameras in various areas, which could be viewed from the front desk. (*Id.* at 13-17; Def.'s Resp. to Pl.'s Interrog. 4, Doc. 120-13 at 4-5; Ricky Vaughn Dep., Doc. 131 at 79; Neemita Amin Dep., Doc. 120-5 at 2; Johnny Johnson Dep., Doc. 133 at 34-35). Defendant regularly stationed an employee at the front desk to monitor the property. (Vic Amin Dep., Doc. 144 at 46). Housekeeping and maintenance employees served both buildings. (*Id.* at 19). At the time, the Hilltop Inn offered weekly rentals, though it no longer does. (*Id.* at 48).

According to Mr. Amin, the hotel's employees were instructed to report signs of sex trafficking to management, but he claimed that no one had reported sex trafficking to him prior to this lawsuit. (*Id.* at 69-70). Mr. Amin also claimed that he was not aware of any issues with crime, drugs, or prostitution on the property prior to this lawsuit. (*Id.* at 63-68). Mr. Amin was shown various police reports during his deposition, including a report of a child molestation at the hotel in 2008, and stated that he did not recall any of them. (*Id.*). Nor did he recall staff telling him that sex offenders were living on the property or that the trafficker in this case — Timothy Chappell — was a sex offender. (*Id.* at 65-68). Defendant was unable to identify any former employees at the Hilltop Inn who could confirm or deny these

contentions other than Neemita Amin and Atul Patel. (Def.'s Resp. to Pl.'s Interrog. 3, Doc. 120-13 at 3-4; Vic Amin Dep., Doc. 144 at 93).

### B. Former Employees' Testimony

Over the course of this case, Plaintiff obtained testimony from at least four former employees of the Hilltop Inn who told a wholly different story than that presented by Mr. Amin. Each of the former employees witnessed prostitution and evidence of drug use regularly on the property during Defendant's ownership, some before and some during the time period when Plaintiff was trafficked there. In addition, each former employee had personally witnessed or had been aware of one or more instances in which a minor was being sold for commercial sex on the property.

The consensus among these employees was that they received no training regarding identifying or reporting signs of sex trafficking. (*See* Johnson Dep., Doc. 133 at 33-34 ("Q: Throughout your employment . . . did you ever receive any training on how to recognize sex trafficking? A: No. Q: Did you ever receive any training on how to prevent sex trafficking? A: No."); Vaughn Dep., Doc. 131 at 65-66 ("Q: During your time that you worked at the property, did you ever receive any human trafficking related training? . . . A: No."); Blackmon Dep., Doc. 134 at 62 ("Q: Did you ever receive any training while you were working for Vic at the property?" A: No."); Pauline Madete Dep., Doc. 137 at 91 ("During the time that you worked there, did you ever receive any kind of training on sex trafficking

prevention? A: No. . . . Q: How about any training or written instructions on how to identify sex trafficking? No.")).

The Court provides a few relevant specifics from three of the former employees' testimony.

### 1. Ricky Vaughn

Ricky Vaughn worked at the Hilltop Inn between 2000 and 2015. (Vaughn Dep., Doc. 131 at 7-8). He testified that he did maintenance, cleaned rooms, and did security at the hotel at various times — "[e]verything except working at the front desk." (*Id.* at 7).

Mr. Vaughn was aware of prostitution and drug use on the property and informed Mr. Amin of it. (*Id.* at 18-20, 22-23). He was aware of a pimp who would "drop off [] girls" at the hotel and leave. (*Id.* at 24). Mr. Vaughn also testified about a specific incident in "[20]08 [or] 2010,"[9] in which a missing underage girl, whose family had come to the hotel searching for her, was later found at the hotel. (*Id.* at 26-28). At the time her family came to the hotel, she could not be located. (*Id.*). But later, Mr. Vaughn went into a particular room to do maintenance and saw the underage girl there, engaging in activity he believed to be consistent with selling commercial sex. (*Id.*). Shortly after (apparently after being called back to the hotel by Mr. Johnson, a front desk clerk), the girl's family came to the hotel and took her home. (*Id.*). As discussed in the next section, Mr. Johnson, the front desk clerk,

---

[9] It appears this incident took place in 2008 (or earlier), given that Mr. Johnson, another former employee who stopped working at the hotel in 2008, testified about the same incident.

corroborated testimony about this incident during his deposition. Mr. Vaughn also stated that there were about two other instances where he thought "there might be girls who were under 18 . . . selling sex at the property." (Vaughn Dep., Doc. 131 at 28-29).

According to Mr. Vaughn, Mr. Amin told the staff that they should keep an eye on the sex offenders, and Mr. Johnson came up with the idea to put all of the sex offenders in one place to make them easier to monitor. (*Id.* at 41-42).[10] Mr. Vaughn stated that the sex offenders were generally put in rooms on the second and third floors of the Lower Building. (*Id.* at 41-42).

### 2. Johnny Johnson

Johnny Johnson is a former front desk clerk at the Hilltop Inn who worked there between 2005 and 2008, and at times lived on the property. (Johnny Johnson Dep., Doc. 133 at 45-46). He testified that he saw drug deals occurring on the security cameras. (*Id.* at 78). He also observed significant prostitution activity on the property. (*Id.* at 13-16, 19, 42). Mr. Johnson estimated that during the time he worked the front desk, "more than" once a month he was personally propositioned for commercial sex by women he knew to be sex workers who were trying to avoid being kicked out of the hotel. (*Id.* at 55-60). Mr. Johnson explained that whenever he became aware of prostitution or drug deals occurring on the

---

[10] Mr. Amin stated in his deposition that he did not recall a policy of putting all of the sex offenders in one section of the hotel, nor did he recall probation officers checking in on the sex offenders. (Vic Amin Dep., Doc. 144 at 65-67).

property, he would take a note of it and inform Mr. Amin instead of calling the police. (*Id.* at 78).

Mr. Johnson was aware of two police raids wherein male pimps were arrested at the Hilltop. (Johnson Dep., Doc. 133 at 15-16, 67-69). He informed Mr. Amin about police raids at the property. (*Id.*). Mr. Johnson heard reports from other employees that some of the people selling commercial sex on the property were underage. (*Id.* at 19-20).

Additionally, Mr. Johnson described the same instance as Mr. Vaughn reported, which involved a missing underage girl engaged in commercial sex who was found at the hotel. While Johnson was working the front desk, the family of the missing underage girl came to the property searching for her. (*Id.* at 19-22). Mr. Johnson testified that the girl was later found by another employee (likely Mr. Vaughn) in a room "in the bed, naked, high, and there was a bunch of guys in the room with her," although he never personally saw her. (*Id.* at 19-22, 73-75). After he was informed of the girl's presence, Mr. Johnson called the girl's family members to return to the hotel to pick her up, which they did. (*Id.* at 20-22, 73-75).

Mr. Johnson was also aware of a different minor girl whose mother had been working as a prostitute on the property and who he learned "was basically following . . . her mother's footsteps." (Johnson Dep., Doc. 133 at 22, 75-77). He repeatedly threw the minor girl off the property, but she kept returning. (*Id.* at 22,

75-77). Mr. Johnson's practice was to tell Mr. Amin about these incidents. (*Id.* at 23, 75-77).

During his deposition, Mr. Johnson stated that he showed Mr. Amin a DeKalb County website indicating that there were multiple registered sex offenders living on the property. (*Id.* at 29-30). Mr. Johnson also explained that the staff knew which residents were sex offenders because a probation officer had previously come to the property and given the staff a list of the registered sex offenders living on site. (*Id.* at 30-31). According to Mr. Johnson, the probation officer would come to the property about twice a month and on holidays to check on the sex offenders. (*Id.* at 31). Mr. Johnson stated that, when the probation officer came to the property, he would check in at the front desk and question the staff about the sex offenders, ask if Mr. Johnson had seen them with any kids or engaged in any suspicious activity, and then go to their rooms. (Johnson Dep., Doc. 133 at 31-32). Mr. Johnson stated that Mr. Amin was aware of this procedure. (*Id.*). Mr. Johnson also said that when he worked the front desk, he would place all the sex offenders on the same floor, and there was another area where the staff placed all of the prostitutes.[11] (*Id.* at 32, 35-36).

### 3. Joan Blackmon

Joan Blackmon, who worked as a housekeeper at the Hilltop until 2009 and lived on the property for approximately three years during the time she worked

---

[11] Mr. Johnson stated in his deposition that during the time he worked at the Hilltop (through 2008), he would place the sex offenders on what is now the Econolodge side of the property. (Johnson Dep., Doc. 133 at 32).

there, stated that she personally witnessed prostitution and drug deals occurring on the property. (Blackmon Dep., Doc. 134 at 9-10, 14, 20-21, 134). She believed that when Mr. Amin took over, criminal activity on the property increased. (*Id.* at 29-30). She spoke with Mr. Amin about these issues. (*Id.* at 26–27). Ms. Blackmon claimed that she expressed her concern to Mr. Amin that the prostitutes were "tearing up the rooms," but she said Mr. Amin's response was "[w]e need the money." (*Id.* at 21-22). According to Ms. Blackmon, Mr. Amin's position was that prostitution was what was "bringing the money" to the hotel, and he conveyed to her that "[t]he only way you going to make some money, you got to get these girls back up here working." (*Id.* at 47). Per Mr. Amin's instructions, Ms. Blackmon did not clean the prostitutes' rooms more than once per week and, instead, just gave them towels. (*Id.* at 29-30, 57). Ms. Blackmon also noted that, starting before Naseeb owned and operated the Hilltop, she was paid per room she cleaned — for example, when a customer rented and "use[d] the room for 15 or 10 minutes," and then left, Ms. Blackmon would "go clean the room, then the[] [hotel] [would] rent it again." (Blackmon Dep., Doc. 134 at 48). She said the practice of paying housekeepers this way "was still going on when" Mr. Amin took over, and he was aware of it. (*Id.* at 48-49).

Ms. Blackmon testified that Mr. Amin was aware of a prior employee, "Mario," who years earlier was living at the Hilltop Inn with one or two underage girls whom he was selling for sex. (*Id.* at 13-19, 58-61). She said at some point, Mr. Amin made Mario move out of the property after another employee advised Mr.

Amin that Mario would get Mr. Amin in trouble by having "young girls up there [being sold for] sex." (*Id.* at 18-19, 58-59).

Ms. Blackmon testified that Mr. Amin was also aware that sex offenders were living on the property and, as he had done for the prostitutes' rooms, he instructed her only to clean the sex offenders' rooms once a week and otherwise to just give them towels. (*Id.* at 44-45 ("Q: How were you made aware of sex offenders living at the property? A: Because that [sic] what Vic told me, living right here on the second floor."), 56).

### 4. Additional Relevant Evidence

Though each of these former employees was personally aware of incidents on the property involving prostitution, drug use, and sex trafficking of minors, none of them claimed to have been aware of particular incidents involving any of the sex offenders staying on the property. (*See, e.g*., Blackmon Dep., Doc. 134 at 52 ("They have more problems with the drug dealers and the prostitutes than anything. The sex offender wasn't no problem.")).

Plaintiff provides evidence about two other instances of sex trafficking on the property, which appear to be in addition to those testified to by Mr. Vaughn, Mr. Johnson, and Ms. Blackmon. First, a former employee named Pauline Madete was previously subpoenaed to testify about an instance of sex trafficking that occurred on the property in or around 2009, though she did not recall the details. (*See* Excerpts from Pauline Madete's Dep. Tr., Doc. 120-12 at 97).

Second, Plaintiff includes evidence that an individual named Solomon Mustafa (along with another co-defendant) was convicted for sex trafficking three women at the Hilltop Inn and other hotels between March and May of 2010, shortly before the events at issue in this case.[12] *United States v. Mustafa et al.*, 1:11-cr-234 N.D. Ga. (judgment and commitment entered on September 20, 2012). Plaintiff cites the transcripts from Mustafa's criminal trial, which show that "Mustafa beat, raped, [and] drugged" one of his victims in a room at the Hilltop Inn, "then duct taped her, put sheets over her head, walked her through Defendant's common area (where there are cameras) and stuffed her in the back of his car." (Pl.'s Resp. Br., Doc. 120 at 23 (citing Pl.'s Ex. 15, Excerpts from Mustafa federal criminal trial, Doc. 120-15); *see also* Mustafa Trial Transc., No. 1:11-cr-234-CAP-AJB, Doc. 170 at 65-66). Mustafa also sold two other women for commercial sex at the Hilltop Inn during the same period. (Pl.'s Ex. 15, Doc. 120-15 at 12-13, 14-15 (citing Mustafa Trial Transc., No. 1:11-cr-234-CAP-AJB, Doc. 171 at 131, 165; Doc. 172 at 55-56)). Subpoenaed records from the Hilltop Inn relating to these events were introduced as Government Exhibit 38 at the *Mustafa* trial. (*See* 1:11-cr-234-CAP-AJB, Doc. 150 at 6). Unfortunately, based on the Court's review of the *Mustafa* docket and follow-up with the U.S. Attorney's Office, Exhibit 38 itself has not been preserved. However, the exhibit list reflects some of the trafficked women who stayed at the hotel as well as that there were fifteen pages of records from the

---

[12] Mustafa is serving a life sentence for these crimes. (*See* Excerpts from Mustafa Trial, Doc. 120-15).

Hilltop (Entry 38). (*See* 1:11-cr-234-CAP-AJB, Doc. 150 at 6). The severity of the events occurring in late May and early June 2010 depicted in the *Mustafa* transcript are a noteworthy flag that sex trafficking was apparently accepted as business as usual at Hilltop. As discussed above, Mustafa's main victim at Hilltop was moved from the room to the car after more than a day of severe sexual abuse – with a sheet over her head and some of her body parts visibly bound in taping – only three or four weeks at most before C.B.'s sexual entrapment at Hilltop on June 21, 2010. Mustafa's body-taped victim had just turned 18 on April 30, 2010. (Mustafa Trial Transc., No. 1:11-cr-234-CAP-AJB, Doc. 170 at 45).

## C. Timeline of Events Leading to and During Plaintiff's Trafficking

### 1. Timothy Chappell begins residing at Hilltop Inn.

Timothy Chappell checked in to the Hilltop Inn on May 10, 2010 and paid for his room with cash at a weekly rate of $205. (Receipts, Doc. 120-6; Vic Amin Dep., Doc. 144 at 82-83). Chappell was a registered sex offender who had been released from prison several days earlier; he was treating the hotel room as his residence while he was on parole.[13] (Pl.'s Ex. 7, Excerpts from Ga. Dep't of Corr. Rule 30(b)(6) Dep., Doc. 120-7 at 7; Pl.'s Ex. 8, Timothy Chappell's parole notes ("Parole Notes"), Doc. 120-8 at 30-31, 35). Chappell was 48 years old at the time.

---

[13] The Court notes that the terms "probation" and "parole" are used interchangeably by the parties and witnesses. For purposes of this Order, the Court does not differentiate between the two terms, and notes only that it is undisputed that at all times relevant to this case Chappell was under supervision, was required to register as a sex offender, and was subject to electronic monitoring.

(*See* Criminal Compl., Doc. 1, *USA v. Timothy Lyle Chappell*, No. 1:10-cr-00531-WSD-ECS (November 29, 2010)).

Chappell was initially residing in Room 126, but on or about June 4, 2010, he was moved to Room 254. (*See* Parole Notes, Doc. 120-8 at 15-16; Receipts, Doc. 120-6 at 2). Room 126 was in the Upper Building, on what is now the Econolodge side of the property, and Room 254[14] was in the Lower Building. (Vic Amin Dep., Doc. 144 at 78, 82-83). On June 4, 2010, a parole officer called the Hilltop Inn front desk to verify Chappell's change of room.[15] (Parole Notes, Doc. 120-8 at 15). Chappell continued to reside in Room 254 until he left the property on or about June 23, 2010. (Receipts, Doc. 120-6; Vic. Amin Dep., Doc. 144 at 87-88).

### 2. Chappell Posts a Craigslist Ad for a "Free Room" and Begins Communicating with 15-Year-Old Plaintiff Online.

At some point while Chappell was staying at the Hilltop Inn, he posted an advertisement on Craigslist for a free room for rent for a female. (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶ 5). Plaintiff, who had just turned 15, responded to the ad and started communicating with a man named "Steve."[16] (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶ 6). Plaintiff was living with her aunt at the time, and her intention was to drop out of school and run away. (C.B. Dep., Doc. 123 at 18, 23, 25). Plaintiff

---

[14] Room 254 appears to be in the section of the hotel where testimony indicates other weekly renters, including sex offenders, were regularly placed. (*See* Vaughn Dep., Doc. 131 at 41-42; Blackmon Dep., Doc. 134 at 51).

[15] Vic Amin testified that his front desk staff would not have given out a guest's room number except to law enforcement. (Vic. Amin Dep., Doc. 144 at 78-81).

[16] The Court understands "Steve" to be a pseudonym or false persona of Chappell.

initially told "Steve" that she was older than she was but within a few days he knew her real age. (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶ 7; C.B. Dep., Doc. 123 at 24). According to Plaintiff, "Steve" was not concerned about her age, and they discussed a plan for Plaintiff to live with "Steve" in his apartment. (C.B. Dep., Doc. 123 at 25-28). "Steve" provided Plaintiff with what he told her was a photograph of himself and Plaintiff believed that "Steve" was a white man in his mid-to-late 20s. (*Id.* at 25).

"Steve" eventually introduced Plaintiff to Chappell, whom "Steve" referred to as his "brother Tim." (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶¶ 8, 9; C.B. Dep., Doc. 123 at 30-31). Plaintiff believed Chappell to be in his early-to-mid 30s. (C.B. Dep., Doc. 123 at 32, 35). Plaintiff started talking to Chappell every day, and they discussed a new plan for Plaintiff to move in with Chappell instead of "Steve" because "Steve" was going to be "away and busy." (*Id.* at 31, 35-37). Like "Steve," Chappell knew that Plaintiff was 15 years old. (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶ 10; C.B. Dep., Doc. 123 at 32-33).

### 3. Chappell Rents a Second Room and Arranges for Plaintiff to Come to the Hilltop Inn.

On June 21, 2020, while he was staying in Room 254, Chappell paid for a second room — Room 252 —which was right next to his room and had a single bed. (*See* Receipts, Doc. 120-6 at 3). Chappell paid for Room 252 nightly instead of weekly. (Vic Amin Dep., Doc. 144 at 88-90; *see* Receipts, Doc. 120-6). Chappell mentioned to Plaintiff that he had told housekeeping that they did not need to come to clean Room 252, and it is undisputed that housekeeping did not enter or

attempt to enter Room 252 during the time Plaintiff was there. (C.B. Dep., Doc. 123 at 72).

That evening,[17] after several weeks of talking to Plaintiff online and on the phone, Chappell arranged for someone to pick her up from her aunt's house and take her to the Hilltop Inn. (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶¶ 11, 12; C.B. Dep., Doc. 123 at 44-45). Plaintiff's understanding at the time was that she was going to Chappell's apartment to live with him. (C.B. Dep., Doc. 123 at 48-49). Chappell had not communicated to Plaintiff that she would be going to a hotel or would be expected to have sex for money, and she did not have an understanding that she would be expected to have any sort of sexual relationship with Chappell. (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶ 13; C.B. Dep., Doc. 123 at 36-39). Plaintiff viewed Chappell as someone who was nice and wanted to help her. (C.B. Dep., Doc. 123 at 41).

When Plaintiff arrived at the Hilltop Inn on the evening of June 21, 2010, she was surprised by her surroundings because she thought she would be arriving at an apartment instead of a hotel. (*Id.* at 49). Chappell was also much older than she had expected, and he did not look anything like how he had previously described himself. (*Id.*). Chappell paid the driver and spoke with him for a few minutes while Plaintiff stood with Chappell in the hotel parking lot. (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶¶ 17, 33; C.B. Dep., Doc. 123 at 49).

---

[17] Based on the record, the Court understands that this occurred on June 21, 2010.

After the driver left, Plaintiff went with Chappell up the stairs into his hotel room, Room 254. (C.B. Dep., Doc. 123 at 49). Chappell had already been staying in Room 254 for approximately two weeks by the time Plaintiff arrived. (*Id.* at 69). Plaintiff did not go to the front desk to check in or get a key because Chappell had rented Room 252 earlier that day. (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶¶ 16, 18; Receipts, Doc. 120-6*)*. As Plaintiff walked up the stairs with Chappell, they passed two men talking who stared at her as she passed. (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶ 17; C.B. Dep., Doc. 123 at 51). She was not sure whether the two men were guests or employees. (C.B. Dep., Doc. 123 at 73). When Plaintiff reached Chappell's hotel room, Chappell explained to her that he had gotten her a room next door to his — Room 252. (*Id.* at 52-53). They spent about thirty minutes in Chappell's room before he took her to Room 252 next door. (*Id.*). Chappell then returned to his room. (*Id.* at 53).

### 4. Chappell Advertises Plaintiff for Commercial Sex; Plaintiff is Forced into Sex with Several Men by Chappell.

When Plaintiff entered Room 252, Chappell immediately called her on the phone and said that somebody would be coming over. (*Id.* at 53). He explained that he would need help paying for the room and he had a way for her to make money. (*Id.* at 53, 56). Chappell "pretty much told" Plaintiff during that conversation that she would need to have sex with the man who arrived at her room. (*Id.* at 54). Plaintiff was scared and she did not feel like she had the ability to say no. (*Id.* at 54–55). A man whom the Court will refer to as "John #1" arrived shortly thereafter and purchased commercial sex with Plaintiff from Chappell. (Pl.'s Resp. to Def.'s

SMF, Doc. 121 ¶ 23; C.B. Dep., Doc. 123 at 55-57). John #1 paid Chappell and then left. (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶ 23; C.B. Dep., Doc. 123 at 56-57). Once John #1 was gone, Chappell called Plaintiff and was "upset about the noise." (C.B. Dep., Doc. 123 at 57-58). She went to sleep crying. (*Id.* at 60).

The next day, June 22, 2010, at some time prior to check-out time,[18] Chappell paid for Room 252 for an additional night. (Receipts, Doc. 120-6 at 3 (showing transaction record for payment made on 6/22/2010 for room 252)). That morning, Chappell called Plaintiff again to tell her another man would be coming to her room.[19] (C.B. Dep., Doc. 123 at 60). She believes she "questioned" Chappell during that call. (*Id.* at 61). Although her memory was not clear on the exact sequence of events, at some point that morning, Chappell came to Plaintiff's room and forcibly raped her. (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶ 24; C.B. Dep., Doc. 123 at 61). Another man ("John #2") came to Plaintiff's room, but he left without purchasing commercial sex because he was concerned that Plaintiff was underage and she did not have any identification.[20] (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶ 26; C.B. Dep., Doc. 123 at 63).

---

[18] Vic Amin's testimony indicates that the normal check-out time at the Hilltop Inn was 11:00 a.m. (Vic Amin Dep., Doc. 144 at 30).

[19] At some point that day, possibly on the same phone call, Chappell informed Plaintiff that he had posted advertisements for commercial sex using her photos on either Backpage.com or Craigslist.com. (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶ 25; C.B. Dep., Doc. 123 at 58-59).

[20] One of the expert reports Plaintiff submitted in this matter references "a loud confrontation" between one of the "Johns" and Chappell about Plaintiff being underage

A third man ("John #3") then came to Plaintiff's room. (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶¶ 26, 35; C.B. Dep., Doc. 123 at 63). When John #3 arrived, he asked Plaintiff to hold open the door so that he could search the room. (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶¶ 33-35; C.B. Dep., Doc. 123 at 71-72). While Plaintiff was holding open the door for John #3, an "older, foreign," "[maybe] Indian" woman whom Plaintiff believed to be a housekeeper was standing on the outdoor walkway outside the room with a housekeeping cart. (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶¶ 33-35; C.B. Dep., Doc. 123 at 72-73). The woman watched Plaintiff and made eye contact with her for a few seconds. (C.B. Dep., Doc. 123 at 72-73).

Once John #3 was in the room, Plaintiff asked him for help and if he could take her home. (*Id.* at 63-64). He gave her his phone number and said that he could not help her then, but that he could later. (*Id.*). John #3 then purchased commercial sex with Plaintiff from Chappell and left. (*Id.* at 62-64). One other man, "John #4," came to Plaintiff's room later that day. (*Id.* at 66-67). John #4 purchased commercial sex with Plaintiff from Chappell. (*Id.*). He "got loud" with Plaintiff and tried to get her to drink liquor. (*Id.* at 67).

Distressingly, it appears that, on the same day as these events, June 22, 2010, Chappell received two face-to-face visits to his room from his parole officer and DeKalb County police, first at approximately 4:30 p.m. and again at 6:00 p.m. (Parole Notes, Doc. 120-8 at 13-14). During these two visits, officers searched

(*see* Tallis Rule 26 Report, Doc. 120-17 at 14), but there is no other evidence in the record indicating that such a confrontation occurred.

Chappell's room and computer and discovered pornographic material, including of suspected minors, on Chappell's computer. (Parole Notes, Doc. 120-8 at 13). The officers apparently did not learn that Chappell had rented a second room or, seemingly, investigate that possibility. Plaintiff testified that Chappell told her that his probation officer was coming to visit him and "for [her] to be quiet, don't open the door, don't mess with the blinds, to just be quiet and that he would call [her] when they were gone." (C.B. Dep., Doc. 123 at 69, 179). She never personally saw the officers. (*Id.* at 69-70). Later, Chappell told Plaintiff that the police had "found a picture of [her] on his computer and that was considered a violation of his probation." (*Id.* at 74).

### 5. Plaintiff Escapes Chappell and the Hilltop Inn.

After repeated phone calls from Plaintiff, John #3 returned to the Hilltop Inn that night and drove Plaintiff back to the area near her aunt's house. (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶ 28; C.B. Dep., Doc. 123 at 73-74). In total, the record indicates that Plaintiff was at the Hilltop Inn for approximately twenty-four hours. (Pl.'s Resp. to Def.'s SMF, Doc. 121 ¶ 31; C.B. Dep., Doc. 123 at 179).

During that time, Plaintiff stayed in Room 252 the entire time — except for when she held open the door for John #3 — because Chappell had instructed her not to leave and she was afraid of him. (C.B. Dep., Doc. 123 at 68-70). Plaintiff's only confirmed interaction with Hilltop Inn staff was when she made eye contact with a housekeeper for a few seconds while she held open the door for John #3. (*Id.* at 72-73).

At one point, an unknown person called Plaintiff's room to ask if she was with a white man — *i.e.*, Chappell — and if she was okay.[21] (*Id.* at 69). She told the caller that she was not with him, and that she was okay. (*Id.*). Plaintiff explained that she felt physically threatened by Chappell because of how he had misrepresented himself and because he told her that he had been to prison, in addition to his forcibly raping her. (*Id.* at 68-69).

Chappell was later arrested and in February 2012, pleaded guilty in federal court to trafficking Plaintiff. (Pl.'s Ex. 10, Timothy Chappell's Guilty Plea, Doc. 120-10).

### D. Procedural History

Plaintiff initiated this action on October 13, 2020, and filed an Amended Complaint on November 30, 2020. (Docs. 1, 13). She raised two Counts in the Amended Complaint, both of which she brought under the TVPRA's civil beneficiary provisions. In the first Count, Plaintiff alleged that Defendant was a beneficiary of Chappell's violation of 18 U.S.C. § 1591(a)(1) (sex trafficking of a minor). (Doc. 13 ¶¶ 91–100). In the second Count, Plaintiff alleged that Defendant was a beneficiary of Chappell's violation of 18 U.S.C. § 1589(a)(2) & (4) (forced labor). (*Id.* ¶¶ 101–10). Defendant moved for summary judgment on August 16, 2022. (Doc. 116). Plaintiff opposed the Motion and also requested a hearing for oral argument. (Docs. 120, 136). The Court held a hearing on the Motion on April 5, 2023. (*See* April 5, 2023 Oral Arg. Tr., Doc. 156).

---

[21] The Court understands from the briefing that Plaintiff is Black and Chappell is white.

## II.    Legal Standard

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324-26. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## III.  Discussion

Under the TVPRA, a plaintiff may bring a civil cause of action against a perpetrator of sex trafficking as well as against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]" to recover damages and attorney's fees. 18 U.S.C. § 1595(a).[22]

The Eleventh Circuit has stated that a defendant may be liable under Section 1595 of the TVPRA if it has "either actual or constructive knowledge that the venture in which [it] participated and from which [it] benefited violated the TVPRA as to the [plaintiff]." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 725 (11th Cir. 2021). In considering the sufficiency of a complaint brought under Section 1595, the Eleventh Circuit has held that the plaintiff must plausibly allege that the defendant:

> (1) knowingly benefited,
>
> (2) from taking part in a common undertaking or enterprise involving risk and potential profit,
>
> (3) that undertaking or enterprise violated the TVPRA as to the plaintiff, and
>
> (4) the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff.

---

[22] The quoted version of the statute, which went into effect in 2018, was slightly amended as of January 5, 2023.

*Red Roof*, 21 F.4th at 726. As the Court will discuss, the Eleventh Circuit has not yet considered Section 1595(a) in the context of a motion for summary judgment.

### A. Elements of TVPRA Beneficiary Claim

The Court first provides an explanatory note on its discussion of these elements. Defendant appears to concede in its brief that "applicable case law and admissible evidence likely support the . . . second element[] of [Plaintiff's TVPRA claims." (Def.'s Br., Doc. 116-1 at 9). But it then makes arguments plainly applicable to the second element, Defendant's "participation in a venture." During oral argument, Plaintiff's counsel took the position that any of Defendant's arguments pertaining to the second element should be treated as waived in light of Defendant's position in the briefing, and that the Court should instead focus solely on whether elements three and four of Plaintiff's TVPRA claims are satisfied. (April 5, 2023 Oral Arg. Tr., Doc. 156 at 27). The Court understands why Plaintiff might wish to narrow the issues accordingly; however, in fairness (and given the fairly undeveloped case law in this area), the Court considers the arguments both parties have made (particularly as to elements two, three, and four) without strictly applying each argument to only one element. Further, given the facts here, the evidence Plaintiff cites in support of elements two and four is in many ways intertwined, requiring the Court to discuss both elements in detail. First, though, the Court briefly discusses elements one and three — neither is seriously contested.

### 1. Element One: Defendant's "Knowing Benefit"

"To satisfy the first element of a TVPRA beneficiary claim, a plaintiff must [show] that the defendant 'knew it was receiving some value from participating in the alleged venture.'" *J.G. v. Northbrook Indus.*, No. 1:20-cv-5233, 2022 WL 4482735, at *3 (N.D. Ga. Aug. 2, 2022) (quoting *Red Roof*, 21 F.4th at 724). Plaintiff argues that the first element is satisfied because Defendant knowingly received revenue from its rental of two rooms to Chappell. "Several district courts, including this one, have found that the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard." *Id.*; *see also G.W. v. Northbrook Indus.*, No. 1:20-cv-5232, 2022 WL 1644923, at *2 (N.D. Ga. May 24, 2022) ("*G.W. I*") (finding that "the revenue from the room rental constitutes a financial benefit sufficient to meet the 'knowingly benefited' standard"); *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 565 (7th Cir. 2023) ("as the statutory text clearly dictates, where the defendant is simply aware that it is benefiting, that is enough."). Defendant concedes that this element is satisfied, and the Court agrees.

### 2. Element Three: Venture "Engaged in an Act in Violation of the TVPRA as to the Plaintiff"

The Court momentarily sets aside the issue of whether a "venture" existed (*see* subsection III.A.3, *infra*) to discuss this element. Although this element is nominally contested by Defendant, it appears to the Court that neither party seriously disputes that Chappell's activities at the Hilltop Inn included several acts in violation of the TVPRA as to Plaintiff because he coercively sold her for

commercial sex to three different men and, additionally, raped Plaintiff himself.

As discussed above, Plaintiff's claims here are premised on Chappell's underlying

violations of 18 U.S.C. 1591(a)(1) and 1589(a)(2) and (4). 18 U.S.C. 1591(a)

provides, in relevant part:

> Whoever knowingly . . . recruits, entices, harbors,
> transports, provides, obtains, advertises, maintains,
> patronizes, or solicits by any means a person . . . knowing,
> or . . . in reckless disregard of the fact[] that means of
> force, threats of force, fraud, coercion . . . , or any
> combination of such means will be used to cause the
> person to engage in a commercial sex act, or that the
> person has not attained the age of 18 years and will be
> caused to engage in a commercial sex act, shall be
> punished . . .

18 U.S.C. § 1589(a) provides:

> Whoever knowingly provides or obtains the labor or
> services of a person by any one of, or by any combination
> of, the following means . . .
>
> (2) by means of serious harm or threats of serious harm
> to that person or another person; . . . or
>
> (4) by means of any scheme, plan, or pattern intended to
> cause the person to believe that, if that person did not
> perform such labor or services, that person or another
> person would suffer serious harm or physical restraint,
> shall be punished . . .

As briefly noted above, in 2012, Chappell pleaded guilty to a violation of 18

U.S.C. § 1591. (*See* Superseding Indictment, Doc. 53, *USA v. Timothy Lyle*

*Chappell*, No. 1:10-cr-00531-WSD-ECS (August 16, 2011); Chappell Guilty Plea,

Doc. 120-10). In his Guilty Plea, Chappell agreed that "if this case went to trial, the

Government would prove . . . beyond a reasonable doubt that [] Chappell

knowingly transported, harbored, obtained and maintained by means in and affecting interstate commerce, C.B., a person he knew was not 18 years of age or older, and caused C.B. to engage in commercial sex acts. (Doc. 120-10 at 5).[23] He further agreed that "in or around June 2010, he was an individual required by law to register as a sex offender" when he trafficked C.B. (Doc. 120-10 at 6). In addition, it certainly appears that Chappell "recruited" Plaintiff and caused her to engage in commercial sex acts. Therefore, there is no question that if all of the other elements were met, this element would be no obstacle.

### 3. Element Two: Defendant's Participation in a Venture

In *Red Roof,* looking to the plain language of the phrase "participation in a venture," the Eleventh Circuit held, "to participate in a venture under Section 1595(a), a defendant must take part in a common undertaking [or enterprise] involving risk or profit." 21 F.4th at 727. In defining the phrase this way, the Eleventh Circuit explained that Section 1591, a criminal provision of the TVPRA, defines "participation in a venture" as "'knowingly assisting, supporting, or facilitating a violation of subsection (a)(1),' which criminalizes 'commercial sex act[s]' of minors or obtained through threat or force." *Id.* at 724 (citing

---

[23] In addition, as another court in this district recently stated in *I.R. v. I Shri Khodiyar, LLC,* "no force, fraud, threats, or coercion are necessary to establish a TVPRA violation when a person knowingly transports a person, while knowing or in reckless disregard of the fact that the person is a minor and will be caused to engage in commercial sex." --- F. Supp. 3d ---, No. 1:22-CV-00844-SEG, 2024 WL 1928755, at *8 (N.D. Ga. Mar. 18, 2024) (citing 18 U.S.C. § 1591(a)(1)). Defendant does not dispute that Chappell knowingly transported Plaintiff, caused Plaintiff to engage in a commercial sex act, and knew, or at least recklessly disregarded, the fact that she was 15 years old at the time.

18 U.S.C. § 1591(e)(4)). The Eleventh Circuit declined, however, to "transpos[e] the statutory definition from [the] criminal section to the civil cause of action," both because "Section 1591(a) includes a scienter requirement that does not appear in Section 1595(a)" and because the civil provision becomes a "nonsense sentence" if the criminal definition is read into it. *Id.* Given the Eleventh Circuit's interpretation, liability under Section 1595 requires something less than ***knowing*** participation or "facilitation" of a violation of the TVPRA. *Id.*; *see also G.G.*, 76 F.4th at 558-59 ("As with 'venture,' we should 'liberally' construe 'participation' so that the civil remedy does not demand more of the plaintiff than a criminal prosecution demands of the government. 'Participating' does not therefore require more than 'assisting, supporting, or facilitating' a venture that violates Section 1591." (citing *Peyton v. Rowe*, 391 U.S. 54, 65 (1968))).[24]

The Eleventh Circuit ultimately found that the plaintiffs in *Red Roof* did not sufficiently allege that the defendants had participated in a venture. 21 F.4th at 726. The Circuit placed much weight on the fact that the plaintiffs had defined the ventures at issue explicitly as "sex trafficking ventures," rather than some other type of commercial or illicit venture. As noted above, the Eleventh Circuit concluded, "[i]n short, to participate in a venture under Section 1595(a), a defendant must take part in a common undertaking involving risk or profit."  21

---

[24] Notably, in *G.G.*, the Seventh Circuit found that "participation" should be read as a civil defendant's "culpable assistance" to a trafficker, requiring "only 'a desire to promote the wrongful venture's success,'" but not "actual knowledge of criminal wrongdoing." 76 F.4th at 559 (quoting *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003)).

F.4th at 727. In turn, based upon plaintiffs' failure to further amend their complaint, the Circuit found that plaintiffs had not plausibly alleged that the hotel franchisors "took part in the common undertaking of sex trafficking" with the hotel operators and traffickers.[25] *Red Roof*, 21 F.4th at 726.

The Eleventh Circuit in *Red Roof* noted that its reasoning was consistent with the First Circuit's determination in *Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017) (Souter, J.). *Id.* at 725-26. "The First Circuit held that the plaintiff had plausibly alleged that the operators' association with the plaintiff's sex trafficker was a 'venture' because her abuser 'had prior commercial dealings with the [operators], which the parties wished to reinstate for profit.'" *Id.* (quoting *Ricchio*, 853 F.3d at 555). "Considering these dealings, the plaintiff [in *Ricchio*] also plausibly alleged that, by renting a room to the abuser, the operators were 'associating with him in an effort to force [the plaintiff] to serve their business objective.'" *Id.*

In *Riti*, though, the panel walked back *Red Roof*'s incorporation of *Ricchio*'s broader language regarding participation in a venture — finding the factual context much more specific than was stated in *Red Roof*. The *Riti* panel explained that the

---

[25] The Eleventh Circuit also rejected the *Red Roof* plaintiffs' alternative contention that the "the franchisors participated in commercial ventures to operate hotels and that those hotel ventures violated the statute" because it was raised for the first time on appeal. *Red Roof*, 21 F.4th at 726. But it appears possible that a differently defined venture could be sufficient to state a claim under the statute. *See Doe (K.B.) v. G6 Hosp., LLC,* No. 1:23-CV-2597-TWT, 2023 WL 8650785, at *5 (N.D. Ga. Dec. 14, 2023) (citing *G.G.*, 76 F.4th at 553-54 for the proposition that the "venture" in a TVPRA civil beneficiary claim need not be a sex trafficking venture).

plaintiffs in *Ricchio* stated a claim that the motel operators participated in a sex trafficking venture because they alleged that the operators, who were a husband and wife that lived in the motel themselves,

> "exchang[ed] high-fives [with plaintiff's trafficker] in the motel's parking lot while speaking about 'getting this thing going again,' in circumstances in which [the trafficker's] coercive and abusive treatment of [plaintiff] as a sex slave had become apparent to [the operator]." *Id.* And the operator had "nonchalantly ignored [plaintiff's] plea for help in escaping from [the trafficker's] custody at the motel" and likely seen the trafficker "grab [plaintiff], kick [plaintiff], and force [plaintiff] back toward the rented quarters . . . " *Id.*

2024 WL 505063, at *3 (quoting *Ricchio*, 853 F.3d at 555). *Riti* described these as the "kinds [] of allegations" that "would support a finding that a hotel operator participated in a sex trafficking venture." *Id.*

District courts considering this second element have often referred to at least two methods by which a plaintiff can seek to show a defendant's participation in a venture — by showing a direct association between the defendant and the trafficker, or by showing a continuous (or ongoing) business relationship between the two. *See, e.g.*, *J.G.* 2022 WL 4482735, at *4 (describing how plaintiffs who adequately plead this element at the motion to dismiss stage "connect the dots between the plaintiff's particular experience" and the specific defendant in the case, by, for instance, asserting a direct association and/or a continuous business relationship); *see also M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959 (S.D. Ohio 2019) (using same framework of "direct association" and/or "continuous business relationship"). But in *Riti*, the Eleventh Circuit "decline[d]

to follow" that framework, finding that it was "not set out in the statute or described in our caselaw[.]" 2024 WL 505063, at *2, n. 5.[26]

Although a number of district court decisions in this district have addressed this element of TVPRA beneficiary claims against owners, operators, and/or managers of hotels in the context of a motion to dismiss, only a few have reached the issue on a motion for summary judgment. In two of these (both decided before the Eleventh Circuit's opinion in *Riti* was released), the district court found that fact issues precluded granting summary judgment on this element based on evidence of an ongoing business relationship between the defendants and the traffickers. *Does 1-4 v. Red Roof Inns, Inc.*, 688 F. Supp. 3d 1247, 1255 (N.D. Ga. 2023); *W.K. v. Red Roof Inns, Inc.*, 692 F. Supp. 3d 1366, 1380 (N.D. Ga. 2023).

In *Does 1-4*, the court found, in considering whether the defendants participated in a venture:

> Here, there is evidence from which a jury could find that the Red Roof Defendants **had an ongoing business relationship with known pimps and prostitutes in which they rented rooms to be used for commercial sex and that Defendants knew or should have known that this venture involved violations of the TVPRA.** Such evidence includes, but is not limited to, testimony that: hotel employees regularly observed pimps and prostitutes using the rooms; some of the prostitutes appeared to be young or

---

[26] The Seventh Circuit in *G.G.* agreed with the district court below it that a plaintiff could sufficiently allege (at the motion to dismiss stage) this second element by showing a continuous business relationship between the civil defendant and the trafficker. 76 F.4th at 559. The *Red Roof* opinion also appeared to endorse, at least in some limited fashion, the idea that a plaintiff could meet this element by alleging "prior commercial dealings" which the parties sought to "reinstate" (or perhaps continue) "for profit." *See Red Roof*, 21 F.4th at 726 (quoting *Ricchio*, 853 F.3d at 555).

> underage; Red Roof management had received complaints of prostitution and, as a result, asked hotel employees to book suspected sex workers in rooms located in the back of the hotel where they would be less visible to guests; some employees acted as lookouts and notified the pimps when police were nearby or on the premises; and some of the prostitutes had an emaciated appearance and exhibited signs of physical abuse and Defendants were aware that these manifestations are known indicators of sex trafficking.

688 F. Supp. 3d at 1254 (emphasis added). In *W.K.*, the court adopted portions of the analysis from *Does 1-4*, finding that in its case too:

> the evidence shows that the Red Roof Defendants had an **ongoing relationship with known pimps and prostitutes** at their Smyrna Red Roof hotel before they sold it to the franchisee, Varahi. The evidence shows that, prior to this sale, the Red Roof Defendants and their employees were aware that they were profiting from renting rooms to those pimps and prostitutes. Although Varahi purchased the Smyrna hotel in 2012, there is evidence that the Red Roof Defendants continued to participate in this venture, although to a lesser degree.

692 F. Supp. 3d at 1380 (emphasis added).

Since the *Riti* opinion was released, three cases in this district have considered this element on summary judgment. *I.R. v. I Shri Khodiyar, LLC*, No. 1:22-CV-00844-SEG, 2024 WL 1928755, at *1 (N.D. Ga. Mar. 18, 2024); *G.W. v. Northbrook Indus., Inc.*, --- F. Supp. 3d ---, No. 1:20-CV-05232-JPB, 2024 WL 3166083, at *6 (N.D. Ga. June 14, 2024) ("*G.W. II*"); *A.G. v. Northbrook Indus., Inc.*, No. 1:20-CV-05232-JPB, Doc. 151 (June 14, 2024).[27]

---

[27] *G.W. II* and *A.G.* are related cases which appear substantively identical. As such, the Court will refer to *G.W. II*, as that case is published.

In *I.R.*, the district court denied summary judgment, finding that the plaintiff had provided evidence sufficient to create a genuine issue of material fact as to whether the defendant owner/operator participated in a venture with plaintiff's traffickers. 2024 WL 1928755, at *10. The evidence there indicated that "[d]efendants' employees took steps to facilitate the use of Defendants' premises for trafficking," including managers "go[ing] to the traffickers' rooms when trafficking victims were with adult male 'customer[s],' to see if they 'need[ed] anything,' and victims would answer the door while naked." 2024 WL 1928755, at *7. There was also evidence that a hotel manager solicited and engaged in forced commercial sex from the underage plaintiff in exchange for free lodging. *Id.*

In *G.W. II* and *A.G.*, however, the district court granted summary judgment, finding there was not sufficient evidence to support a finding that the defendant participated in a venture with the plaintiff's trafficker. *G.W. II*, --- F. Supp. 3d ---, 2024 WL 3166083, at *6. The evidence in *G.W. II* included that the 17-year-old plaintiff's traffickers "appeared familiar with the staff at the Hotel," "on one occasion, front desk personnel spoke with [the traffickers] by telephone to confirm that [p]laintiff and her friend could be given access to the room after they were accidentally locked out," "[p]laintiff and her friend attracted clients for their commercial sex work at the Hotel by wearing provocative clothing and loitering in the Hotel's common areas," and she "purchased condoms, food, drinks and hygiene supplies from the front office." --- F. Supp. 3d ---, 2024 WL 3166083, at *1. The district court in *G.W. II* described the "common thread" between *Red Roof*

and *Riti* as "a requirement that the plaintiff (i) show at least some connection between the hotel operator's and the trafficker's actions (the common venture) and (ii) identify what actions the operator took to advance the object of the joint undertaking (participation in the common venture)." --- F. Supp. 3d ---, 2024 WL 3166083, at *4.

Turning to the instant case, Plaintiff relies on the Eleventh Circuit's language in *Red Roof* discussing *Ricchio* to argue that "[h]aving prior commercial dealings" with a trafficker and thereafter renting a room to the trafficker is sufficient to establish Defendant's participation in a venture with her trafficker, Chappell, in this case. (Pl.'s Resp. Br., Doc. 120 at 17 (citing *Red Roof*, 21 F.4th at 726)). Of course, the instant Motion was briefed prior to the Eleventh Circuit's opinion in *Riti*, which, as noted above, discounted the helpfulness of the "direct association" and "continuous business relationship" frameworks and distinguished *Ricchio*. *See Riti*, 2024 WL 505063, at *2, n. 5, 4.

Recall that in *Red Roof*, the Eleventh Circuit defined this element as "taking part in a common undertaking or enterprise involving risk and potential profit." Notably, Plaintiff's Complaint defined the "venture" as Defendant's "rent[ing] Chappell hotel rooms." (*See* First Am. Compl., Doc. 13 ¶¶ 95, 105). In her response to Defendant's Motion for Summary Judgment, she contends that Defendant's "rental of rooms to Chappell is a common undertaking that involved risk because Chappell could have destroyed the rooms like others did," and involved potential

profit "because the rent money could provide a profit" to Defendant. (Pl.'s Resp Br., Doc. 120 at 17).[28]

As a starting point, Plaintiff has certainly adduced concrete evidence of Defendant Naseeb's involvement in the Hilltop's day-to-day operations as owner/operator, as well as testimony that would support that Mr. Amin, Defendant's owner/manager, was fully aware that his business was financially supported by allowing unfettered, ongoing prostitution on the property.

Plaintiff does not argue, though, that there was a "direct association" between Defendant and Chappell here. Instead, she relies on evidence she contends demonstrates a "continuous business relationship" between Defendant and Chappell — in particular, the receipts from Chappell's visits at the hotel, which indicate that Chappell checked in to the Hilltop on May 10, 2010, and checked out on June 24, 2010, approximately two days after Plaintiff escaped. (*See* Receipts, Doc. 120-6). She notes that Chappell stayed in Room 254 continuously from June 6 to June 24, but rented Room 252 at a nightly rate on two subsequent nights, the night of June 21 and the night of June 22, the timeframe in which Plaintiff was trafficked. (*Id.*). Further, Plaintiff argued at oral argument that as soon as Defendant renewed its relationship with Chappell by renting Chappell his own room for a second night (before Plaintiff even arrived), this action provided a sufficient basis to establish the existence of a continuous business relationship for

---

[28] As noted earlier, this definition of the venture differs from that provided by plaintiffs in *Red Roof*, where plaintiffs defined the venture as a "sex trafficking venture." 21 F.4th at 727.

purposes of the participation in a venture element. (April 5, 2023 Oral Arg. Tr., Doc. 156 at 27-30).

Defendant argues that Plaintiff's evidence is insufficient to establish the existence of a continuous business relationship. At oral argument, Defendant's counsel took the position that Plaintiff could only establish the existence of a continuous business relationship if there was evidence that Defendant had allowed Chappell to use its rooms for trafficking on at least two separate occasions, *i.e.*, if there was evidence that Defendant had continued to rent Chappell a room *after* becoming aware that he had *previously* used a room for trafficking on a prior occasion. (April 5, 2023 Oral Arg. Tr., Doc. 156 at 53-55). From Defendant's perspective, Plaintiff could potentially satisfy the continuous business relationship requirement if Chappell had subsequently returned to the same hotel to traffic Plaintiff again, but a single trafficking event would not establish the existence of a continuous business relationship. *Cf. J.G.*, 2022 WL 4482735, at *5 (finding plaintiff adequately alleged existence of continuous business relationship when traffickers "had *previously* rented rooms at the United Inn to traffic women for sex" and "*were back again* to engage in sex trafficking with Plaintiff") (emphasis added); *G.W. I*, 2022 WL 1644923, at *3 (finding existence of continuous business relationship at motion to dismiss stage when "Defendant had rented a room to her trafficker *in the past* for the purpose of sex trafficking" and the trafficker "was presently engaged in sex trafficking with Plaintiff") (emphasis added).

Defendant is correct that Plaintiff's trafficking was not as long in duration as those alleged in some other cases, and Plaintiff was not held at the Hilltop Inn for more than the single occurrence at issue here. For instance, in *I.R.*, the plaintiff provided evidence that she was trafficked at defendant's hotel "on five separate occasions for up to a week at a time," 2024 WL 1928755, at *2; in *J.G.*, the plaintiff alleged that she had been trafficked in multiple distinct periods for up to two weeks at a time, 2022 WL 4482735, at *1; and in *M.A.*, the plaintiff alleged that she had been trafficked for multiple days or weeks in succession on separate months in two consecutive years, 425 F. Supp. 3d at 962, 967. Here, it is undisputed that Plaintiff was trafficked for a single continuous period of approximately twenty-four hours over two days, but she was raped four times by four different men over the course of that time period. This would have persisted for still more days but for Plaintiff's arranging an escape through one of the men.

In the Court's view, given the facts here and the Eleventh Circuit's interpretation of this element as stated in its *Red Roof* and *Riti* opinions, neither party's formulation is completely correct. Adopting Plaintiff's view that as soon as Defendant renewed Chappell's own room rental one time, it was participating in a venture with him, would effectively mean improperly collapsing the first and second elements into one. As for Defendant's argument, the Court believes it would be nonsensical to find that a hotel operator could not be found liable under 18 U.S.C. § 1595(a) unless a trafficker had trafficked a victim in its hotel for some period of time, left the hotel, and subsequently returned to the hotel to continue

trafficking activities. Certainly, such a construction is not warranted by the statutory language, and the Eleventh Circuit's decisions in *Red Roof* and *Riti* made no mention of such a requirement.

The evidence put forth by Plaintiff shows that Chappell had been residing at the Hilltop Inn for some time, and Defendant was on notice of the fact that he was a classified sex offender because law enforcement had called days earlier to confirm his room number. Then, Defendant rented Chappell a second room by the night and allowed him to decline housekeeping for that room. Finally, Defendant renewed the rental of the second room for an additional night during the time Chappell was trafficking Plaintiff, facilitating Chappell's trafficking activities at least in some fashion.

But the Court does not find, given these facts, that renting a second room to Chappell (even knowing his status as a sex offender), without more, could establish that it entered into a common undertaking with him. The testimony indicates that Defendant permitted, if not explicitly endorsed, housekeeping and room assignment practices that enabled prostitution, and generally turned a blind eye to conduct that should have raised red flags as to trafficking and sexual exploitation on the property.[29] And there is certainly evidence that Defendant would rather

---

[29] As discussed in detail above, the record indicates ongoing prostitution and drug abuse at the Hilltop Inn, as well as incidents of severe sexual violence on the property between March and May 2010 that became the basis of criminal charges and a successful prosecution brought by the U.S. Attorney's office in the *Mustafa* case. *See United States v. Mustafa et al.*, 1:11-cr-234 N.D. Ga. (judgment and commitment entered on September 20, 2012).

(and did in fact) rent rooms to individuals engaged in illegal activity, such as prostitution, than risk its rooms sitting empty — Defendant obviously had a profit motive for doing so. That said, there is not evidence presented here that would support a finding that Defendant took any action to support or facilitate Chappell's specific activities, beyond allowing him to purchase the room rental. For these reasons, the Court finds that there is no genuine issue of material fact as to whether Defendant participated in a venture, as currently defined by the Eleventh Circuit, with Chappell.

Even given this finding, the Court finds it exceedingly difficult to detach the analysis of this second element from its analysis of the fourth element. Assuming for the sake of argument that Defendant did engage in a "common undertaking" to rent rooms to Chappell and he used those rooms to violate the TVPRA, the question becomes — is there evidence sufficient to show a genuine issue of material fact as to whether Defendant knew, or should have known, that this undertaking violated the TVPRA as to Plaintiff? The Court considers that question below.

### 4. Element Four: Defendant's Actual or Constructive Knowledge that the Venture Violated the TVPRA as to Plaintiff

The Court turns, then, to the fourth element of the civil beneficiary claim – whether Defendant Naseeb "knew or should have known" that the venture violated the TVPRA as to Plaintiff.[30] Ultimately, given the evidence presented here, the

---

[30] Although the caveat that the defendant must have actual or constructive knowledge "as to the plaintiff" is not in the statutory language, the Eleventh Circuit included it in its formulation of this element in *Red Roof. See* 21 F.4th at 725 ("[defendants] may be liable under the TVPRA if they have either actual or constructive knowledge that the venture in

Court is unable to find that there is a genuine issue of material fact as to whether Defendant knew or should have known of ***this Plaintiff's*** trafficking.

As the Eleventh Circuit discussed in *Red Roof*, "[k]nowledge requires '[a]n awareness or understanding of a fact or circumstance.' Knowledge, Black's Law Dictionary (11th ed. 2019). Constructive knowledge, on the other hand, is that knowledge which 'one using reasonable care or diligence should have.' Constructive Knowledge, Black's Law Dictionary (11th ed. 2019)." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 725 (11th Cir. 2021). Although the Eleventh Circuit did not refer to this language as setting a negligence standard, its use of these familiar definitions indicates the statutory language is appropriately construed in such a fashion.

In *G.G.*, the Seventh Circuit did explicitly refer to the "known or should have known" language as a "negligence standard." 76 F.4th at 555 n.9. The Seventh Circuit expounded, "all courts agree that a defendant under Section 1595 must have had at least constructive knowledge that the "venture" in question has engaged in an act in violation of Section 1591 in order for participant liability to attach." *Id.* (collecting cases).[31]

---

which they participated and from which they benefited violated the TVPRA as to the [plaintiff].").

[31] Recall that in *G.G.*, the Seventh Circuit commented regarding the Eleventh Circuit's opinion in *Red Roof*: "if we incorporate Section 1591's 'knowingly' scienter into Section 1595, we render 'superfluous' Section 1595's 'should have known language.'" 76 F.4th at 558, n. 14.

Defendant argues that there is no evidence to show that it had knowledge of Plaintiff's presence at the hotel, let alone that it "knew or should have known" that Plaintiff was being trafficked by Chappell in violation of the TVPRA. Defendant's arguments principally rely on language in *G.W. I*, stating that the third element was satisfied in that case because the defendant there "had a reasonable opportunity to observe" the plaintiff.[32] 2022 WL 1644923, at *3. Defendant emphasizes that it had no reasonable opportunity to observe Plaintiff, given the short duration of her time at the Hilltop Inn and her minimal interactions with staff. (Def.'s Br., Doc. 116-1 at 10-13). For instance, Defendant argues that the housekeeper's few seconds of eye contact with Plaintiff when Plaintiff held open the door for John #3 did not constitute a reasonable opportunity to observe Plaintiff, and that, even if it did, Plaintiff's claims would still fail because "observing something is not the same as participating in it." (Def.'s Br., Doc. 116-1 at 12 (quoting *Red Roof*, 21 F.4th at 727)).

As Defendant correctly states, there is no evidence of a direct association between Defendant and Chappell that would establish its actual knowledge of Chappell's trafficking of C.B. In contrast to some other cases, Defendant's

---

[32] In *G.W. I*, the defendant had argued at the motion to dismiss stage that it could not be held liable as a civil beneficiary of the trafficking of a minor because it had no reason to believe that the plaintiff was under the age of 18. 2022 WL 1644923, at *3; *see also A.G. v. Northbrook Indus., Inc.*, No. 1:20-CV-05231-JPB, 2022 WL 1644921, at *3 (N.D. Ga. May 24, 2022) (defendant making same argument). Defendant makes no such argument here, and even if it had, whether a defendant had a "reasonable opportunity to observe" is relevant to a criminal violation under Section 1591(a), not this civil beneficiary provision.

employees did not act as lookouts for Chappell, nor were they otherwise directly involved in his operation. There is also no evidence that Chappell had previously rented rooms at the Hilltop Inn for sex trafficking purposes.

Defendant notes that, in other cases where courts have found evidence that hotel management knew or should have known that a plaintiff was being trafficked, the sex trafficking venture had operated openly and obviously for a much longer period of time, and the plaintiff(s) had multiple personal interactions with hotel employees that would have put the operators of the hotels on notice that by continuing to rent rooms to the traffickers they were directly facilitating a sex trafficking venture. *See, e.g.*, *I.R.*, 2024 WL 1928755, at *2, *7 (describing multiple interactions between hotel staff/managers and the plaintiff and her traffickers); *Does 1-4*, --- F. Supp. 3d ---, 2023 WL 5444261, at *3 ("some employees acted as lookouts and notified the pimps when police were nearby or on the premises; and some of the prostitutes had an emaciated appearance and exhibited signs of physical abuse and [d]efendants were aware that these manifestations are known indicators of sex trafficking").

The facts of this case, while certainly shocking and painful, may not be as egregious as those in some other cases arising under this statute. The Court acknowledges, of course, that any instance of trafficking is egregious for the trafficked person. In those other cases, though, the evidence inarguably pointed toward hotel operators or managers having *actual* knowledge of trafficking of the plaintiff(s) at the hotel. But as the Eleventh Circuit stated in *Red Roof*, actual

knowledge is not the standard set by Congress for civil liability under the TVPRA — constructive knowledge is sufficient. 21 F.4th at 725.

Here, there is no evidence tying Plaintiff's trafficking to hotel employees directly, but the testimony of the former employees indicates that the employees had placed Mr. Amin, an owner and manager of the hotel, generally on notice of various prior instances of sex trafficking at the hotel. And Plaintiff argues that there is in fact significantly more evidence that Defendant facilitated (or at least exhibited indifference to) sex trafficking on its property and that it therefore should have known that *she* was being trafficked.

For starters, Plaintiff contends that Defendant operated the Hilltop as a "Drug Infested Prostitution Den" in which prostitution was condoned, if not outright encouraged. (Pl.'s Resp. Br., Doc. 120 at 5). As evidence that prostitution was encouraged at the Hilltop, Plaintiff points to Ms. Blackmon's testimony that Mr. Amin told her that prostitution was what was "bringing the money." (Blackmon Dep., Doc. 134 at 46). Plaintiff also notes that Ms. Blackmon, Mr. Johnson, and Mr. Vaughn all testified that the hotel placed weekly guests, including prostitutes, in a specific area of the hotel. Further, Ms. Blackmon said she was instructed to clean the rooms for prostitutes only once per week and to otherwise just provide the residents in those rooms with towels. Plaintiff suggests that these policies were designed to facilitate prostitution on site and Defendant's profit therefrom.

Further, the evidence indicates that Defendant was on notice of sex offenders residing on its property, and also instructed employees to place them in a specific area of the hotel and to clean their rooms only once a week and otherwise to just give them towels.

In addition, Plaintiff argues that there were numerous prior incidents at the Hilltop Inn that should have put Defendant on notice of sex trafficking on site, including several incidents involving the trafficking of underage girls. For example, Plaintiff points to the former employees' testimony about an employee, Mario, who sold an underage girl for commercial sex, and Mr. Johnson's testimony that some minors had previously been found selling commercial sex at the hotel.

Perhaps most significantly, Plaintiff adds that a trafficking incident involving Solomon Mustafa occurred at the Hilltop Inn within weeks prior to Plaintiff's trafficking. As Plaintiff puts it, "Mustafa beat, raped, [and] drugged[] [one victim] at Defendant's hotel, and then duct taped her, put sheets over her head, walked her through Defendant's common area (where there are cameras) and stuffed her in the back of his car." (Pl.'s Resp. Br., Doc. 120 at 23) (citing Pl.'s Ex. 15, Excerpts from Mustafa Trial, Doc. 120-15). This occurred at most about three to four weeks before Plaintiff was trafficked in 2010. The record from Mr. Mustafa's trial also indicates that Mustafa sold two other women for commercial sex while he was staying at the hotel. *Id.*

From Plaintiff's perspective, these incidents would have surely put Defendant on notice that sex trafficking was an ongoing, significant problem at the

Hilltop and was well known by the staff and Mr. Amin. In sum, given the evidence here, a reasonable jury could find that Defendant was on actual or constructive notice of *prior* instances of sex trafficking (not involving Plaintiff or Chappell).

However, as discussed earlier, knowledge of separate prior instances alone is not sufficient to meet the standard for a TVPRA claim, which, under the Eleventh Circuit's formulation, now appears to require actual or constructive knowledge *as to the trafficking of the individual plaintiff*, plus some degree of acceptance or welcome of that trafficking. *Riti*, 2024 WL 505063, at *4 ("K.H.'s allegations amount to contentions that . . . Riti observed signs of sex trafficking at the hotel. But . . . observing signs of sex trafficking 'is not the same as participating in it.'" (quoting *Red Roof*, 21 F.4th at 726)).

With respect to her own situation, Plaintiff contends that despite the relatively short timeframe of her time at the Hilltop and her minimal interactions with staff, there is still sufficient evidence to create a fact issue as to whether Defendant knew or should have known that Plaintiff was being trafficked. This evidence includes:

1. Chappell was known by Defendant to be a sex offender, as evidenced by his parole notes, which indicated his parole officer called the front desk and was told he was staying there and his room number, as well as the fact that his room was moved to an area of the hotel consistent with where other sex offenders were placed;

2. Chappell requested a second room right next to his own room on a per-night basis and Defendant apparently heeded Chappell's instruction that its housekeeping staff not clean the second room;

46

3. On the same day that Chappell first rented the second room, a vehicle dropped Plaintiff off out front at night — in view of the front desk monitor — with Chappell, an older man of a different race who was a known sex offender;

4. Plaintiff's presence at the hotel with Chappell was conspicuous enough that someone called her room and asked if she was with a "white man" (Chappell) and if she was okay;

5. A housekeeper saw her with one of the "Johns" while she held open the door during his room search; and

6. Police came to Chappell's room at least twice on June 22, 2010, shortly after he had rented (and renewed the rental for) the second room.

Plaintiff also notes that Chappell called her to scold her for making too much noise after John #1 came to her room, and that John #4 "got loud" with her, both of which suggest that a hotel employee could have heard what was going on in the room — just like the unknown person who called her room to inquire if she was okay. One of Plaintiff's experts, Alan Tallis, stated that in his view there were multiple red flags that were indicative of sex trafficking in Plaintiff's case, but he specifically identified Chappell's rental of the second room as a "Bright Red Flag." (Alan Tallis Rule 26 Report, Doc. 120-17 at 18). In Mr. Tallis's words, "You don't rent an adjoining room to a known sex offender without making appropriate inquiry for the reasons a second room was needed." (*Id.*). Mr. Amin himself admitted that his staff made a mistake renting a second room to a sex offender without inquiring as to the reason for the rental. (Vic Amin Dep., Doc. 144 at 89-90). Yet none of these facts, standing alone or in in combination, apparently warranted any attention from Defendant.

But even construing all of those pieces of evidence in the light most favorable to Plaintiff (as the Court must as this stage), the Court is unable, under the current Eleventh Circuit standard, to find that there is a genuine issue of material fact as to whether Defendant knew or should have known that this specific "venture" was proceeding in violation of the TVPRA with regard to her trafficking. None of the evidence indicates that Defendant knew or should have known that Plaintiff was being trafficked in this short timeframe — absent consideration of the broader pattern of ongoing practices at the hotel.

The Court makes one final note, given the direction of the Eleventh Circuit's case law on this element thus far. After *Riti*, this Court is hard-pressed to envision a factual scenario in which the Circuit would find constructive knowledge sufficient to find a defendant liable as a civil beneficiary under § 1595. Looking to elements two and four together, if "observing" signs of sex trafficking (and even ignoring those signs) "is not the same as participating in it," as the Eleventh Circuit has stated, it appears to the Court that nothing less than some form of evidence of a defendant's actual knowledge of a plaintiff's presence on the property, plus some overt act to establish the defendant's "participation" — such as employees serving as lookouts — would be sufficient to survive summary judgment. *Red Roof*, 21 F.4th at 727. In the Court's view, this construction of the statute is far more limiting than its language requires.

**B. Plaintiff's Claims for Punitive Damages and Attorney's Fees**

Defendant's final argument in its Motion for Summary Judgment is that Plaintiff's claims for punitive damages and attorney's fees should be dismissed because they are predicated on a finding of liability under the TVPRA and, in Defendant's view, "Plaintiff has failed to produce sufficient evidence to establish any genuine issue of material fact to survive summary judgment as to her civil beneficiary liability claims." (Def.'s Br., Doc. 116-1 at 19). Because the Court grants summary judgment on Plaintiff's TVPRA claim, the Court accordingly grants summary judgment to Defendant on these claims as well.

**IV. Status of Plaintiff's Motions to Seal (Doc. 122, 145)**

In its Order dated December 6, 2022 (Doc. 152), the Court indicated that it was denying in part Plaintiff's Motions to Seal (Doc. 122, 145) but would allow some of the documents subject to the Motions to "remain on the docket in provisionally sealed form until Plaintiff has had the opportunity to provide the Court and opposing counsel with proposed redactions" and supplied criteria for those proposed redactions. The Court allowed until January 4, 2023, for the Plaintiff to submit such proposed redactions after providing them to opposing counsel. It appears to the Court from review of the docket that Plaintiff has filed only a redacted version of her Motion to Seal at Doc. 145 (*see* Doc. 153), not any of the other documents. If Plaintiff would like any of the other documents subject to her Motion to remain under seal, she must first provide proposed redactions for those documents to opposing counsel, and then must provide the Court with a

renewed motion to seal and proposed redactions on or before **September 26, 2024**.

## V.    Conclusion

This is clearly a dreadful case where a young teenage girl was manipulated and seriously sexually exploited and abused. The relative uniqueness of the factual issues in this case is challenging, but the issues posed in this case also suggest the need for further consideration of the rigid legal standards most recently adopted in *Riti*. Given the evidence Plaintiff has presented and the current state of the Eleventh Circuit's case law, the Court must find that Plaintiff has not shown a genuine issue of material fact as to the second and fourth elements of the TVPRA's civil beneficiary provision. Defendant's Motion for Summary Judgment [Doc. 116] is **GRANTED**. The Clerk is **DIRECTED** to enter judgment for Defendant and close the case.

**IT IS SO ORDERED** this 12th day of September, 2024.

**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**